HAETSCH, Administratrix, Respondent, vs. THE CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

*March 1 — March 16, 1894.*

*Railroads: Killing of person at highway crossing: Contributory negligence: Failure to look or listen: Presumption.*

1. Plaintiff's intestate, while driving on the highway at night, was killed at a railway crossing by defendant's train.   He was familiar with the crossing, and if he had looked would have seen the headlight, or if he had listened would have heard the train, before he came so near the crossing that he could not safely have stopped his horse.   *Held*, that he was guilty of contributory negligence, the presumption being that he did not look or listen.

2. The fact that the train was five minutes behind its usual time was no excuse for a failure to look or listen.

3. The principle which relieves one from responsibility for the consequences of an error of judgment in choosing the best means of escape from imminent peril in which he is suddenly placed, is not applicable where he is placed in the perilous position by his own negligence.

APPEAL from the Superior Court of *Milwaukee* County. Action to recover for the death of plaintiff's intestate, alleged to have been caused by defendant's negligence. The facts are stated in the opinion.   The defendant appeals from a judgment in favor of the plaintiff.

Haetsch vs. The Chicago & Northwestern R. Co.

For the appellant there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas,* and oral argument by *F. C. Winkler.*

*W. H. Timlin,* for the respondent, to the point that there was no presumption of law that a person killed at a crossing did not stop to look and listen, cited *Hoye v. C. & N. W. R. Co.* 67 Wis. 1; *Mynning v. D., L. & N. R. Co.* 64 Mich. 93, and cases cited; *Penn. R. Co. v. Weber,* 76 Pa. St. 168; *Ill. Cent. R. Co. v. Nowicki,* 148 Ill. 29.

ORTON, C. J.    There are several errors assigned by the appellant's counsel, relating to the testimony and the instructions of the court to the jury, some of which appear to be sufficient to work a reversal of the judgment in this case and make it proper that there should be a new trial.    But we are so clearly and firmly of the opinion that the plaintiff ought not to have recovered, on the evidence, that we deem it our duty to reverse the judgment on the merits of the case.    At the conclusion of the testimony, appellant's counsel moved the court to direct a verdict for the defendant.    We shall confine our consideration of the case to the error of the court in denying said motion, in comparison with which the other errors are unimportant and need not be considered.    We shall further restrict our inquiry to the single question of the contributory negligence of the deceased.    It is on that fact alone (which we are of the opinion was clearly established by the evidence) that the court ought to have granted the motion.    The negligence of the appellant company in not ringing the bell or blowing the whistle at the proper place, which was the only negligence charged, was the subject of conflicting and contradictory testimony, and therefore a proper question for the jury and not for the court.    It is not a pleasant duty to reverse the judgment on this ground, where our duty is in conflict

Haetsch vs. The Chicago & Northwestern R. Co.

with our sympathy. But we must follow where our best legal judgment leads us, and the law is our only guide.

The facts known of this unfortunate accident are very few, but, as we shall see, they are vastly important in solving the question of the negligence of the deceased. The railway of the defendant from Madison to Milwaukee runs nearly east; and a highway called Janesville Plank Road, or Forest Home Avenue, runs from the city southwesterly, and crosses the railway near Layton Park station, and so on into the town of Lake. The deceased was about forty years of age, and had a wife and two children. He lived in the town of Lake, about a mile and a half from this crossing. He was a gardener, and marketed his products in the city, and was accustomed to pass over this crossing, back and forth, and was acquainted with the locality and with the running of the trains over the crossing. On the 31st day of October, 1891, in the evening, about half-past 7 o'clock, he was returning, in his one-horse, empty wagon, from the city, towards his home. The train was due at the crossing 25 minutes before 8 o'clock, but on that evening it was about five minutes late. His horse and the forward wheels of his wagon had passed over the crossing, when the train from Madison on this railway collided with the rear of the wagon, and threw the deceased to the ground, and killed him instantly. The night was dark and windy, and there was much dust flying in the air about the highway. The wind was blowing in the direction the train was running. The jury found a general verdict in favor of the plaintiff, and therefore must have found that the bell on the engine of the train was not rung or the whistle blown at the proper place before approaching this crossing. The train was running about twenty miles an hour. For about 1,000 feet on the highway, coming towards the crossing, the deceased could have seen the headlight of this train at several places, but most of the distance his view of it was

obstructed by trees and other objects. But the fact is undisputable that, for the last about 100 feet before reaching the crossing, he could have seen the headlight of the approaching train, and there was no obstruction of his view, whatever. When he reached that point on the highway, the train could not have been much over 500 feet from the crossing, and the distance became less as he approached it. The blazing headlight could have been seen by him at every step of that 100 feet, and if he had listened he would have heard the rumbling noise of the train. The headlight is elevated, that it may be seen and cast its light a long distance ahead and around. One of the principal witnesses for the plaintiff, Philip Dooley, was the keeper of the toll-gate just south of the crossing; and he testified that he thought there were some evergreens in the way at one place, but they were no higher than the headlight, and there was no obstruction to the view for seventy-five or eighty feet from the crossing. On the map used on the trial, where all obstructions to the view are supposed to be marked, there is none for that 100 feet, and the evidence appears to be conclusive that for that distance from the crossing there was nothing to obstruct the view. But, if the deceased had an unobstructed view of the approaching headlight for seventy-five or eighty feet before he came to the crossing, the material fact is not changed or impaired,— that, if the deceased had looked while approaching the crossing, he would have seen the headlight.

There was but one living witness to the collision, and that was one George C. Kuhns, who was fireman on the engine. He testified that he was sitting on the left-hand side of the engine, ringing the bell; when the train was about ten feet from the crossing, he saw a man urging his horse to get across; and that when he was eight or ten feet from the crossing the horse was on a run, and the man was striking him and urging him on, and before he got across the engine

struck him.  On cross-examination his testimony before
the coroner's inquest was stated to him, and it was insisted
that he then testified that he saw the horse on a run when
on the crossing.  But the witness still repeated that the
man was eight or ten feet from the rail, and that he was
in the act of striking his horse, and he struck him more
than once.  One thing seems to be quite certain, and that
is, if the horse was on the crossing and on the run when
the fireman first saw him, and the train was then at the
cattle guard or ten feet from the crossing of the highway,
the wagon would have escaped the collision.  Two or three
jumps of a running horse would have carried the wagon
over in much less time than the train could reach it.  The
only significance of this evidence is that the horse was on
a run on or so near the crossing.  The deceased could have
seen the train before he came so near the crossing, if he
had looked, and, if he did not see it until he was within
eight or ten feet of the crossing, he could then have stopped;
and this is very positive evidence of his want of common
care and prudence.  The fact that the horse was on the
run on the crossing is nearly conclusive evidence that he
started to run before he was on the crossing.  It takes
some time to get such a horse, or any horse, into a run.
The only real significance of the fact that the horse was
thus seen on a run is that it might be inferred from it that
the deceased saw the train before he came to the crossing,
and was trying to outrun it after seeing it so near.  But
such gross negligence or recklessness ought not to be at-
tributed to him as a mere inference from such a fact.  It is
doubtful whether this evidence materially affects the case
one way or another, and all doubts ought to be resolved in
favor of the deceased.

This comprises all the evidence there is, showing any
want of common care and prudence on the part of the de-
ceased which contributed to his death.

It may be true, as claimed by the learned counsel of the respondent, that, if the deceased had not seen the train until he was on the crossing, he had the right to drive on as the best means of escape. But the principle that a person, in a sudden emergency, must select the best means of escape that occurs to him, and he will not be held liable if he fails to choose the best, is not applicable or material to this case. His negligence must be found in what he did or omitted to do before he found himself in such an emergency. From the testimony, it must be accepted as an unquestionable verity that the deceased would have seen the train approaching the crossing before he arrived so near to it that he could not have safely stopped his horse, had he looked in that direction. It is true the night was dark and windy, and much dust was in the air; but the headlight of the engine was high above the train, and the darkness added intensity to the light. The wind and dust would have much more easily obscured the view of an approaching train in the day-time than they would or could an approaching headlight in the night-time. The headlight was intended to be seen at night from a long distance, as a warning to travelers, and to light up the track and discover obstructions in advance of the train, and it answers well its purpose. It is inconceivable that the dust in the air raised by the wind from a highway would cut off or much obscure a distant view of that headlight. Mere dust in the air, raised by the wind, was never so dense as that. Every reasonable hypothesis, theory, or inference should bear in favor of the common care of the deceased as he was approaching that dangerous and fatal crossing, together with every reasonable presumption; but it would be grossly unreasonable to hold that he could not have seen that headlight from anywhere within 80 or 100 feet of the crossing, if he had cast his eyes in that direction. The nearer he approached the crossing, his duty to look

increased, as well as the certainty that he would have seen the train approaching. Anywhere within the distance of 100 feet he was almost in the presence of immediate danger.

It is said the train was late about five minutes. That is so short a time that he could scarcely have considered it, and much less depended upon it as evidence that the train had passed. He was well acquainted with that crossing, and had passed it often, no doubt, about the same time in the evening, on his way homeward from the city; and he must have observed, if he thought of it at all, that trains are often late at least that much. It would not do to say that a traveler approaching a railroad crossing should be excused from listening or looking for a train because it is five minutes beyond its usual time of passing. It is a fact that no one of ordinary care and prudence would rely upon as an excuse for not listening or looking. It would be fool-hardy and reckless for a person, for such a reason, to rush upon the crossing without looking.

It is also true, as contended by the learned counsel, that the contributory negligence of the deceased is a matter of defense to the action, unless it appears by the testimony of the plaintiff or other evidence in the case. It is insisted, however, that there is no such evidence. We have these positive and material facts: (1) That the deceased could have seen the train approaching if he had looked, or could have heard it if he had listened, before he came upon the crossing. (2) He came upon the crossing and was killed by the train. (3) The presumption in favor of life is that he came upon the crossing without seeing the train or knowing that it was so near. Therefore, he did not look or listen, and therein he was negligent. If he did look, and saw the train approaching and so near the crossing, and then drove on and ran his horse, supposing that he could pass the crossing ahead of the train, as seems quite plausible, he was grossly negligent. These facts, clearly estab-

lished by the evidence, are conclusive of the want of common care of the deceased that contributed to his death. Under the same circumstances, if a plaintiff should testify, in his own case of injury, that he did look and listen before driving upon the crossing, we would say, as the supreme court of Pennsylvania said in *Myers v. B. & O. R. Co.* 150 Pa. St. 386, " that it is trifling with justice to permit a jury to find that it is true." That the deceased did look and did not see the train was a natural and physical impossibility.

If there is anything in the pretext that the deceased could not see the headlight, then his duty to stop before passing the crossing and listen was doubled; and, if he had done so, he would not only have heard, but seen, the train then so near. In *Butterfield v. Western R. Corp.* 10 Allen, 532, it was a stormy night, raining, blowing hard, and snowing, and the plaintiff had his hand up, holding his hat on, which prevented him from seeing the train; and he was walking over plowed ground and had to watch his steps, and he was expecting to hear the bell or whistle. The court said: " He was well acquainted with the highway and railroad. He attempted to cross the railroad without looking, or intending to look, to see whether a train was crossing; and he stepped on the track, and was struck by a train that was passing at that moment. It was dark, but the engine had a headlight which he could not have failed to see if he had looked. The plaintiff's neglect to use his eyes was palpable neglect, and he states no reasonable excuse for it. The jury ought, therefore, to have been instructed that he had offered no evidence of due care on his part, and was not entitled to a verdict." The court said, further, " Before attempting to cross, a man should make a reasonable use of his sense of sight as well as of hearing, in order to ascertain whether he will expose himself to a collision," and cites the following cases: *Shaw v. B. & W. R. Corp.* 8 Gray, 73; *Warren v. Fitchburg R. Co.* 8 Allen, 227; *Comm. v.*

*Fitchburg R. Co.* 10 Allen, 189; *Stevens v. O. & S. R. Co.* 18 N. Y. 422. If the plaintiff in the above case had been killed on the crossing, that and the present case would be clearly alike. If a traveler's view is so obstructed that he cannot see, and by reason of the force of the wind or other cause he cannot hear, an approaching train, his duty requires him to stop his team and listen for the train before attempting to cross over. *Seefeld v. C., M. & St. P. R. Co.* 70 Wis. 216. The two cases of *Hansen v. C., M. & St. P. R. Co.* 83 Wis. 631, and *Schmolze v. C., M. & St. P. R. Co.* 83 Wis. 659, are closely in point. The duty of a person approaching a railroad crossing to look and listen for a train before attempting to cross over has been affirmed in cases too numerous to be cited. When there was no obstruction to prevent the deceased from seeing the headlight of the approaching train before he drove on the crossing, the presumption is that he did not look. *Brown v. C., M. & St. P. R. Co.* 22 Minn. 165.

We are compelled to the conclusion that the deceased contributed to his death by a want of ordinary and common care, and that the court ought to have directed the jury to find a verdict for the defendant.

*By the Court.*— The judgment of the superior court is reversed, and the cause remanded for a new trial.

The presumption as to due care of person found killed by alleged negligence of another is the subject of an extended *note* to *Hendrickson v. G. N. R. Co.* (49 Minn. 245), in 16 L. R. A. 261.— REP.