CHICAGO & N. W. RY. CO. v. ANDREWS.

(Circuit Court of Appeals, Eighth Circuit. April 6, 1904.)

No. 1,889. ·

1. RAILROADS—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE.

Plaintiff stepped upon a railroad crossing at a small station directly in front of a train which was moving eastward at a speed of 50 miles an hour, and was struck and injured. It was in the daytime, and he testified that he stopped momentarily 6 feet north of the track, and listened and looked in the direction from which the train was approaching, but could not see because of smoke and steam blown across the track by a strong northwest wind from a pumphouse 200 feet west of the crossing, the smokestack of which was 25 feet high and 18 feet north of the nearest rail. He also testified that he did not hear the train nor any whistle. The engineer testified that he saw plaintiff apparently about to cross the track, and gave two alarm whistles. Eighteen out of 19 witnesses for both parties also testified that they heard such whistles. A number of other witnesses testified that they looked along the tracks westward, and readily and plainly saw the approaching train, and there was no testimony except plaintiff's that the view was obstructed. *Held* that, in view of the physical facts, as well as such testimony, the testimony of plaintiff that he stopped and looked and listened without seeing or hearing the train was contrary to all reasonable probability, and not worthy of credence; that, if the view was obstructed nearly to the crossing, as he testified, such fact required him, in the exercise of ordinary care, to take greater precautions before going on the track, and in either event he was guilty of such culpable negligence as precluded him, as matter of law, from recovering for the injury, conceding the negligence of the railroad company.

2. EVIDENCE—NEGATIVE TESTIMONY.

The rule that affirmative testimony is to be preferred to negative is not an absolute one, which requires the entire rejection of negative testimony, but is applied as a proper means of determining the relative value or weight of testimony. Where the attention of those testifying to a negative was not attracted to the occurrence which they say they did not see or hear, and where their situation was not such that they probably would have observed it, their testimony is not inconsistent with that of witnesses who were in a situation favorable for observation, and who testify affirmatively and positively to the occurrence.

Thayer, Circuit Judge, dissenting.

·In Error to the Circuit Court of the United States for the Southern District of Iowa.

Frank F. Dawley (N. M. Hubbard, Jr., and Charles E. Wheeler, on the brief), for plaintiff in error.

George H. Carr and B. O. Clark (James P. Hewitt, A. C. Parker, and Craig T. Wright, on the brief), for defendant in error.

Before SANBORN, THAYER, and VAN DEVANTER, Circuit Judges.

VAN DEVANTER, Circuit Judge. This was an action by Andrews against the railway company to recover damages for personal injuries sustained by him in a street crossing accident wherein he was struck

¶ 2. Negative testimony, see note to Delaware, L. & W. R. Co. v. Devore, 52 C. C. A. 82.

See Evidence, vol. 20, Cent. Dig. § 2434.

by one of the company's passenger trains. The petition charged the company with negligence in propelling its train over the crossing at a high rate of speed without ringing the bell or giving other timely warning. The answer denied the statements of the petition, and alleged that the injury was due to plaintiff's negligence in not exercising proper care and caution for his own protection. Plaintiff recovered in the Circuit Court. The controlling question is whether the jury should have been directed to return a verdict for defendant because of contributory negligence on the part of plaintiff. Defendant's double-track railroad crosses Main street in Scranton, a small town in Iowa, at right angles, the railroad extending east and west and the street north and south. The north track is used by east-bound trains and the south track by those west-bound. The space occupied by the tracks in the vicinity of the crossing is about 50 feet in width. The crossing is at grade, and the tracks extend westward in a straight line over level ground for a mile and a half or more. West of the street and north of the tracks, but not less than eight feet from the north rail, are a water tank, pumphouse, and toolhouse—all small structures. The distances from the center of the street to these structures are about: water tank, 90 feet; pumphouse, 200 feet; and toolhouse, 375 feet. The pumphouse is used to shelter a stationary engine employed in pumping water into the water tank. The smokestack to this engine is approximately 12 inches in diameter and 25 feet in height, and is 18 feet from the north rail. North of the tracks and west of the street about 800 feet are stockyards. The accident occurred about 11 o'clock in the forenoon, January 24, 1901. A west-bound freight train upon the south track was moving slowly toward the crossing. An east-bound passenger train, called the "Chicago Special," struck plaintiff as he stepped upon the north track on his way over the crossing to a grain elevator south of the tracks. This passenger train usually traveled at a high rate of speed, and did not stop at Scranton. On this occasion it was composed of one of the largest passenger engines, weighing 90 tons, and eight cars, was traveling about 50 miles an hour, and was an hour late. Plaintiff was a stone mason, 40 years of age, in good health, and had good hearing and eyesight. He had worked much in the neighborhood of the railroad, frequently crossed the tracks at the crossing, knew of the double track, the surroundings at the crossing, and the speed of the Chicago Special. He also knew that a train might pass at any time, and that some of the trains, including this one, did not stop at Scranton. It will be assumed that the evidence showed negligence on the part of defendant in that the bell on the passenger engine was not rung as required by the statute (section 2072, Code Iowa 1897), and that the flagman at the crossing, instead of being where plaintiff was accustomed to see him, was at a place where he could not be seen by plaintiff, and failed to give warning of the approach of the passenger train. In approaching the crossing from the north, the view of the railroad to the west was somewhat obstructed by the structures and the stockyards before named, and, while there was a conflict in the evidence upon the point, it will be assumed that plaintiff was not negligent in failing to see the approaching passenger train before he reached

the immediate vicinity of the tracks. The claim that plaintiff's negligence proximately contributed to the injury rests largely upon the evidence bearing upon the extent to which the view to the west along the tracks was obstructed by smoke and steam from the pumphouse. Plaintiff testified that no whistle was sounded; that he approached the crossing to a point near the center of the street, and within about six feet north of the north rail; that the west-bound freight train on the south main track was then nearing the crossing, "was going very slow," and "did not make any noise to amount to anything"; that from this point he looked carefully along the tracks in both directions, and listened attentively, but could not see or hear any train other than the freight train; that the view along the tracks to the west was entirely obstructed by heavy smoke and steam from the pumphouse, which was being carried upon and across the tracks by a strong wind from the northwest, and that this smoke and steam extended "clear to the crossing." In view of the other evidence, it is important to note plaintiff's specific description of the precaution taken by him for his own safety. He testified:

"I walked down to the track, where I went to cut across. * * * I came to a halt, and stopped and listened, and I looked west and see this [pumphouse] smoke, saw this [freight] train coming up over the east side on the south track slowly, and looked for this other [west-bound] passenger, which was about due, east of it; then stopped again, with my left foot over the rail of the north track; then heard the chickering of the rail of the north track; then I looked up. When I heard the chickering I looked up, and throwed up my right hand and jumped. When I looked up I saw the [east-bound passenger] train. The engine seemed to swell right up—to come right up. Then I made a desperate leap to get out of the way, and said 'Oh!' as I jumped. * * * I looked west first, then I looked east, and I saw this freight. The head of the freight engine was ° * * near about the street line on the east side of the street. * * * A team had just crossed the street ahead of me, across the track. * * * The smoke that came from this pumphouse did not obstruct the view of the crossing at all as I looked south. * * * [Before I reached the crossing] this freight train from the east was a little east of the street. I had seen it. I see it moving up that way. I hurried in order to cross ahead of it. I hurried down to the track. As I walked down towards the track, I walked pretty fast so as to get ahead of that [freight] engine. I intended to cross ahead of the [freight] engine, if the coast was clear. * * * Q. So that you looked west, to see if there was a train coming when you first reached the track? How close were you then? A. Oh, about six feet, I should judge. The freight engine had not yet crossed. I came down to a halt then. Just stopped and looked up the track, and then looked east. Where I stopped still was near about the center of the crossing. I was not between the rails. Was outside of the north rail; near about six feet from the north rail. When I thought there was no danger, I moved to get across the track. When I finally started to go across the track, I did not stop any more, but it was the engine of the passenger train that stopped me. * * *. At the time, after I listened, I made the start across the track, and stepped my right foot and then the left, and I was over the north rail when I heard the jar or chinkling of the rails, and I looked up and saw the train coming right at me. * * * I placed my eyes on this freight train, and advanced across the track, and heard the chinkling of the rails, and looked up and saw this train, and jumped to the right off the track. * * * I did not see the other train until I heard the chinkling of the rails and looked up as I was moving across the street and jumped to the right. * * * When I looked towards the west for the train, I saw a man in the middle of the track, just coming in that smoke—just coming that way. I could not tell who that was, his back was to me. He was not as far away as the toolhouse. He was along by the tank, in there. * * * · This man had been in the middle of the track

and went up that way. He was getting right just into the edge of the smoke. I do not know where he went to then. He had disappeared when I turned my head to look. That cloud of smoke did not hide him. He was going right into the smoke when I saw him. I could not see into the smoke a little ways. I saw the man right in the edge, the smoke whirling around him. * * * I turned, and looked east for the other trains, and looked for this [freight] train across the track. Q. Then did you look back again to the west? A. No, sir; not until I heard the chickering of the rails. Q. When you passed the water tank, you only looked west once, did you? A. Once. When I looked at the train—saw the train. Q. After passing the water tank, you only looked west once until the time you were struck—just the instant before you were struck? A. No, I looked, I think, twice, because I turned my head and looked up the track, and then stepped on this plank and looked up there again, and saw this man advance up the track in the middle, and then saw this [freight] engine, and looked eastward, and ventured across the track. * * * Q. And just before taking these two steps that brought you to the track; that is, the last time you looked to the west? A. No, sir; I looked again just before I advanced to step on the track; that is when I saw the man. At that time I could not see any engine. I don't know whether the man got hit by the engine. I was not looking that way then. Q. After you saw that man disappear in the cloud of smoke, you only took just one step or so before you got hit, did you? A. The second step. Q. The second step after you looked west and saw the man, you got hit? A. Stepped with the right foot first, and then with the left foot over the north rail. I got the left foot clear over the rail. I saw the engine, and made a desperate effort to get out of the way. I don't know how close the engine was. I thought it was right after me; seemed to swell right up and strike me with terror. Q. You did not see it until the instant it struck you? A. Just as I gathered myself to jump, it came right at me, and I just said 'Oh!' as I jumped. * * * I did not hear anything but the chickering of the rail, was all the signal I had of that train; that was too late to do me any good. * * * Q. Now, when you stopped and stood there, and looked west to see if you could see the train, you say the cloud of smoke prevented you from seeing down the track, so that the look did not help you any. You could not determine whether there was a train or not when you looked, could you? A. No, sir. The time I stood there listening about two steps north of the track was pretty short. It was a very short time. Q. You did not wait there long enough to do any more than just look and turn back again and look? A. And look at the crossing and this other [freight] train to see if the coast was clear. * * * I looked west first. Q. Then you saw the smoke, and then you looked east and walked across? A. No, I looked east and to this other [freight] train. And I started to go across. [On my way to the crossing] I noticed some men out west there. Did not know who they were. Noticed them up there about the toolhouse. Just noticed a handcar there. Noticed men up there. * * * When I got down within a couple of steps, and looked west, I did not see anything of the section men. All I saw was one man advancing up in the center of the track. He was up a little above the tank. * * * Q. And nothing to obstruct your view down that track for a whole mile, except this smoke you speak of? A. The smoke and the man in the center of the track. * * * [On my way down to the crossing] I met Mr. Holden, and said 'Good morning.' I walked rather fast from there down to the six feet from the tracks. Not just expressly for the purpose of crossing ahead of the freight train. I was in a hurry for my business that I had to perform. I did not think I was a little late in getting there. I thought I had plenty of time to do it, but I didn't usually go lounging along; * * * am a quick active man in that way. * * * Q. But so far as the [freight] train alone was concerned, you would have had time to go through ahead of the freight train? A. I would not have had plenty of time."

Seven witnesses for plaintiff gave testimony bearing upon some of the matters to which plaintiff testified. Shaffer, who was on Main street at a considerable distance north of the crossing, says plaintiff stopped a few feet north of the north rail, and looked both east and west. Taft, Robertson, Shaffer, and Clews say that smoke in con-

siderable quantity was coming from the pumphouse, but none of them says or indicates that it obstructed, or was sufficient to obstruct, the view along the railroad. Williams, who came over the crossing from the south about two minutes before the accident, says he looked to the west along the tracks for a quarter of a mile, and "I had no trouble making up my mind there was no train anywhere near me towards the west. I could see all right. There was nothing to prevent me from seeing." Clews, who was in the toolhouse, heard the "rumbling of the train and the clatter of the rails" about five seconds before the train passed the toolhouse, and "heard two short whistles after the engine and part of the train had passed that point." The other six heard two sharp blasts of the whistle given at the water tank. Taft also heard the rumbling of the train before the two blasts of the whistle. None of the seven heard the train or its whistle prior to the times stated. This is the whole of the evidence produced by plaintiff upon the subject under consideration.

Of the witnesses for the defendant, five, who were in the immediate vicinity of the crossing, say they looked along the tracks to the west, past the water tank and pumphouse, and readily and plainly saw the approaching train; and four, who were at or west of the pumphouse, say they looked along the tracks to the east, and readily and plainly saw the crossing and objects about it. All were in positions where they necessarily looked through the identical space in which plaintiff locates the smoke, and all refer to the time when the train was approaching and was within a mile of the station. Olive, a druggist, testified that he started west along the north track on his way home; that when near the water tank he saw the approaching train about a mile away, and retraced his steps to the sidewalk on the west side of the street and north of the tracks, where he remained until after the train passed; that he followed the train with his eyes, and when it was whistling saw the steam from the whistle; that after passing the stockyards the whistle was sounded sharply and loudly more than once; that the smoke did not interfere with the view of the tracks to the west, or prevent seeing the train; and that he was the second person to reach plaintiff after the accident. McClure, assistant cashier of a bank at Scranton at the time of the trial, but station agent for defendant company at the time of the accident, says he looked to the west out of the bay window in the south side of the depot, which was immediately north of the tracks and east of the street, and distinctly saw the train about a half mile from the station. Sparks, the engineer of the passenger train, testified that he saw objects about the crossing for three-quarters of a mile as he approached the station; that he saw the plaintiff, and, as the latter did not appear to notice the approach of the train, a succession of short blasts of the whistle was given, commencing before the train reached the pumphouse. Thompson, the head brakeman of the freight train, testified that he was on the depot platform about 200 feet east of the place of the accident, and readily saw the passenger train approach from near the stockyards; that he heard the danger signals and saw plaintiff; that plaintiff did not appear to notice the coming train, and he (the witness) hallooed with all his might to attract plaintiff's atten-

tion, and was the first to reach plaintiff after the accident. Griffe, a farmer, who was in a poultry store which faces west on Main street, says he heard a shrill whistle, and on stepping out of the door heard two other blasts of the whistle and the rumbling of a train, and then saw the passenger train pass the water tank. Six of defendant's witnesses, including the engineer and fireman of the passenger train, say a station whistle and a crossing whistle were distinctly sounded before the stockyards were passed. Ten of them say there was whistling before the water tank was reached, and eleven say there was whistling at the water tank. All but one of the eleven saw the train before it reached the crossing, and those familiar with the operation of trains describe the later blasts of the whistle as "danger signals."

Counsel for defendant call attention to the rule which prefers the testimony of a witness who testifies to an affirmative to that of a witness who testifies to a negative (Stitt v. Huidekoper, 17 Wall. 384, 394, 21 L. Ed. 644; Rhodes v. United States, 25 C. C. A. 186, 79 Fed. 740; Allen v. Bond [Ind.] 14 N. E. 492, 496), and urge that it be applied to the testimony respecting the sounding of the whistle. The rule is not absolute. Northern Pacific Railroad Co. v. Freeman, 174 U. S. 379, 381, 19 Sup. Ct. 763, 43 L. Ed. 1014. It rests upon common experience, and is applied as a proper means of determining the relative value or weight of conflicting testimony, and not as a basis for the entire rejection of negative testimony. But where the attention of those testifying to a negative was not attracted to the occurrence which they say they did not see or hear, and where their situation was not such that they probably would have observed it, their testimony is not inconsistent with that of credible witnesses who were in a situation favorable for observation, and who testify affirmatively and positively to the occurrence. There is then no conflict. Horn v. B. & O. Ry. Co., 4 C. C. A. 346, 351, 54 Fed. 301; Hubbard v. Boston & A. R. Co., 159 Mass. 320, 34 N. E. 459; Culhane v. N. Y. Cent., etc., Co., 60 N. Y. 133, 137. We do not deem it necessary to consider the opportunity for observation possessed by each of plaintiff's witnesses, or the effect to be given to their testimony that they did not hear the earlier whistling described by defendant's witnesses. It is sufficient to say that of the 19 witnesses who testified about the blowing of the whistle, all but plaintiff, irrespective of the party by whom they were called, declared that at least two danger signals were sounded at the water tank by the whistle of the passenger engine. Considering the speed of the train, that there were two of the signals, necessarily sounded in succession, and that the occasion for giving them must have been conveyed to the mind of the engineer before either of them was given, this evidence is nothing short of a perfect demonstration that the engineer, before passing the space which plaintiff says was filled with smoke, looked directly through it, and saw plaintiff about to cross the tracks. It is equally a demonstration that plaintiff could have looked through the same space and have seen the approaching train. There is also the testimony of nine witnesses, as before stated, who say that, at the very time when plaintiff claims to have looked, they looked along the tracks through the same space, and readily and plainly saw the objects beyond it. And Wil-

liams, plaintiff's witness, declares he saw through this space two minutes before, and found it free from obstruction. Of all the witnesses plaintiff alone says he looked along the tracks and found the view obstructed by smoke; that he listened, and could not hear the train. He is mistaken. Common knowledge tells us that in the presence of a strong wind blowing across the track the train could not have been entirely or largely obscured by smoke issuing from a small smokestack 25 feet in the air and only 18 feet from the track. The action of the wind would necessarily dissipate the smoke, and prevent it from falling to the ground in large volume so near the stack from which it was being discharged. If plaintiff had looked with any care, he would have seen the train. It was there. His presence upon the track and the collision were practically simultaneous. His mistake is disclosed by his own testimony, wherein he admits his controlling anxiety to cross in advance of the freight train, and says: "I placed my eyes on this freight train, and advanced [two steps] across the track, and heard the chinkling of the rails, and looked up and saw this [passenger] train." He actually stepped immediately in front of the moving train. If plaintiff had listened attentively, he would also have heard the approaching train before he took the two unfortunate steps. Common knowledge tells us that a train of cars drawn over a railroad track by a 90-ton engine at a rate of 50 miles an hour makes a great noise, and that even a strong wind, not of extraordinary or unusual velocity or force, does not render it possible for such a train to come unexpectedly upon one who possesses a good sense of hearing and is reasonably employing it for his protection under circumstances which otherwise permit its free use. That plaintiff, in possession of good sight and hearing, could have looked and listened, and not have seen or heard the train, which must have been in plain view, and making a great noise, is contrary to all reasonable probability, in opposition to the physical facts, and impossible of belief. In these circumstances his testimony that he looked and listened is entitled to no credence, and does not create a conflict in the evidence. Artz v. Chicago, etc., R. R. Co., 34 Iowa, 153, 159; Stafford v. Chippewa, etc., Co., 110 Wis. 331, 345, 349, 85 N. W. 1036; Marland v. Pittsburgh, etc., R. R. Co., 123 Pa. 487, 490, 16 Atl. 624, 10 Am. St. Rep. 541; Hauser v. Central R. R. Co., 147 Pa. 440, 445, 23 Atl. 766; Myers v. B. & O. R. R., 150 Pa. 386, 390, 24 Atl. 747; Lake Erie, etc., R. R. Co. v. Stick, 143 Ind. 449, 459, 463, 41 N. E. 365; Kelsay v. Mo. Pac. Ry. Co., 129 Mo. 362, 374, 376, 30 S. W. 339; Payne v. C. & A. R. R. Co., 136 Mo. 562, 575, 579, 584, 38 S. W. 308; Chicago, etc., Ry. Co. v. Pounds, 27 C. C. A. 112, 114, 82 Fed. 217; So. Ry. Co. v. Smith, 30 C. C. A. 58, 62, 86 Fed. 292, 40 L. R. A. 746. In Chicago, etc., Ry. Co. v. Pounds, supra, the plaintiff had testified that about 50 feet before reaching the crossing "he looked south, but did not see any train, and could not see down the track more than 300 yards, to a place where a fence approached the track, because the wind raised a cloud of dust which obstructed his view beyond that point." It was said by Judge Thayer, in speaking for this court:

"It is suggested, however, that there was evidence tending to show that at one point, about 50 feet from the crossing, the plaintiff did glance down the track, but failed to see the train, and that such testimony rendered it necessary for the jury to determine whether he exercised due care. There are two answers to this suggestion. In the first place, it seems physically impossible that the plaintiff could have looked at the point indicated without seeing the train, which was then in plain view, and was seen by every one else in his vicinity."

The duty of persons approaching and going upon railroad crossings has heretofore been the subject of careful consideration in this court. Reynolds v. Great Northern Ry. Co., 16 C. C. A. 435, 69 Fed. 808, 29 L. R. A. 695; Pyle v. Clark, 25 C. C. A. 190, 79 Fed. 744; Chicago, etc., Ry. Co. v. Pounds, supra; Chicago, etc., Ry. Co. v. Rossow, 54 C. C. A. 313, 117 Fed. 491. In the Pounds Case the subject is fully covered in Judge Thayer's opinion as follows:

"The doctrine is too well settled to admit of controversy that a person is guilty of culpable negligence if he walks or drives upon a railroad crossing in close proximity to an approaching train, which is in plain view, and might have been seen for a considerable distance before he reached the track. The precautions which a person traveling upon the highway must take when he approaches a railroad crossing are so well defined that it is no longer the province of a jury to decide whether such person was guilty of negligence in those cases where it is obvious that in approaching the crossing he failed to look up and down the track as he might have done, and thereby avoided all risk of injury. It is universally conceded that a person omits not only a reasonable but a necessary precaution when he drives upon a railroad crossing, at a place where his view is unobstructed, without looking along the track with sufficient care to ascertain with certainty whether a train is coming from either direction. A railroad track is in itself a warning of danger, because trains may be expected to pass at any moment. Therefore the courts have repeatedly declared that a person is, as a matter of law, guilty of contributory negligence if he drives upon a crossing without making a vigilant use of his senses of sight and of hearing. If either of these senses is impaired, or for any reason cannot be exercised to advantage, he ought to be more vigilant in the use of the other."

We adhere to this statement of the law because it is eminently right, and because it is sustained by the decisions of the Supreme Court of the United States, and by the decisions of courts generally. Railroad Co. v. Houston, 95 U. S. 697, 24 L. Ed. 542; Schofield v. Chicago, etc., Ry. Co., 114 U. S. 615, 5 Sup. Ct. 1125, 29 L. Ed. 224; Aerkfetz v. Humphreys, 145 U. S. 418, 12 Sup. Ct. 835, 36 L. Ed. 758; Elliott v. Chicago, etc., Ry. Co., 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068; Northern Pacific R. R. Co. v. Freeman, 174 U. S. 379, 19 Sup. Ct. 763, 43 L. Ed. 1014; Blount v. Grand Trunk Ry. Co., 9 C. C. A. 529, 61 Fed. 375; MacLeod v. Graven, 19 C. C. A. 616, 73 Fed. 627; Shatto v. Erie R. R. Co., 59 C. C. A. 1, 121 Fed. 678; Dunworth v. Grand Trunk Ry. Co. (C. C. A.) 127 Fed. 307; McCrory v. Chicago, etc., Ry. Co. (C. C.) 31 Fed. 531, by Judge (now Mr. Justice) Brewer; Lake Shore & M. S. R. R. Co. v. Miller, 25 Mich. 274; Butterfield v. Western Railroad Corporation, 10 Allen, 532, 87 Am. Dec. 678; Fletcher v. Fitchburg R. R. Co., 149 Mass. 127, 21 N. E. 302, 3 L. R. A. 743; Debbins v. Old Colony R. R. Co., 154 Mass. 402, 28 N. E. 274; Salter v. Utica, etc., R. R. Co., 75 N. Y. 273; Heaney v. Long Island R. R. Co., 112 N. Y. 122, 19 N. E. 422; Foran v. N. Y. Cent., etc., R. R. Co., 64 Hun, 510, 19 N. Y.

Supp. 417; Flemming v. Western Pacific R. R. Co., 49 Cal. 253; Oleson v. L. S. & M. S. Ry. Co., 143 Ind. 405, 42 N. E. 736, 32 L. R. A. 149; Marty v. Chicago, etc., Ry. Co., 38 Minn. 108, 35 N. W. 670; Haetsch v. Chicago, etc., Ry. Co., 87 Wis. 304, 58 N. W. 393; Steinhofel v. Chicago, etc., Ry. Co., 92 Wis. 123, 130, 65 N. W. 852.

The general rule is that a person going upon or over a railroad crossing is required to use for his own protection ordinary care—such care as men ordinarily exercise under the same or similar circumstances. The amount of care which will satisfy this requirement is necessarily adjusted to and varies with the danger to be guarded against. As the danger, or the probability of injury therefrom, increases, so do men ordinarily increase the care which they exercise for their own protection. If, therefore, when plaintiff approached the crossing, smoke interfered with the view along the tracks to the west, and prevented him from readily or plainly determining whether a train was coming from that direction, he was at once apprised of the increased danger, and it became his duty to exercise greater caution and vigilance for his own safety than would have been required otherwise. This is what men in general would have done, and is what a man of ordinary prudence would ordinarily have done. It is what the law imperatively requires of one in such a situation. Among the cases last cited, the following applied this rule where the view along the track was obstructed by smoke, dust, or otherwise: Chicago, etc., Ry. Co. v. Pounds; McCrory v. Chicago, etc., Ry. Co.; Shatto v. Erie R. R. Co.; Butterfield v. Western Railroad Corporation; Fletcher v. Fitchburg R. R. Co.; Debbins v. Old Colony R. R. Co.; Heaney v. Long Island R. R. Co.; Foran v. N. Y. Cent., etc., R. R. Co.; Flemming v. Western Pacific R. R. Co.; Oleson v. L. S. & M. S. Ry. Co.; Marty v. Chicago, etc., Ry. Co. Instead of adjusting his caution and vigilance to the increased danger, plaintiff, according to his own statement, made only the most casual observation of the surroundings, and hastily advanced upon the track without in the least assuring himself that a train was not approaching from the west. His observation was not even sufficient to enable him to judge whether the claimed obstruction by the smoke was of some permanence, or was merely momentary, and would be lifted by the next gust of wind. He testified:

"Q. * * * You could not determine whether there was a train or not when you looked, could you? A. No, sir. The time I stood there listening about two steps north of the track was pretty short. It was a very short time. Q. You did not wait there long enough to do any more than just look, and turn back again and look? A. And look at the crossing and this other [freight] train to see if the coast was clear. * * * I looked west first. Q. Then you saw the smoke, and then you looked east and walked across? A. No. I looked east and to this other [freight] train. And I started to go across."

He took but two steps when the train was upon him. It is impossible to regard this otherwise than as gross negligence. With no real precaution for his own safety, and not acting under any controlling necessity, plaintiff stepped from a place of entire security to one of great danger, when a moment's reflection and attentive observation would have avoided the injury.

We assume, as before stated, that defendant was negligent in not complying with the statutory requirement to ring the bell, and in not having the flagman at his accustomed place to give warning of the approach of the train. If plaintiff's injury were the proximate result of this negligence of defendant company unmixed with negligence of his own, he would be entitled to recover; but this is not the case made by the evidence. The controlling rule is stated in Railroad v. Houston, 95 U. S. 697, 702, 24 L. Ed. 542:

"Negligence of the company's employés in these particulars was no excuse for negligence on her part. She was bound to listen and to look before attempting to cross the railroad track, in order to avoid an approaching train, and not to walk carelessly into the place of possible danger. Had she used her senses, she could not have failed both to hear and to see the train which was coming. If she omitted to use them, and walked thoughtlessly upon the track, she was guilty of culpable negligence, and so far contributed to her injuries as to deprive her of any right to complain of others. If, using them, she saw the train coming, and yet undertook to cross the track, instead of waiting for the train to pass, and was injured, the consequences of her mistake and temerity cannot be cast upon the defendant. No railroad company can be held for a failure of experiments of that kind. If one chooses, in such a position, to take risks, he must bear the possible consequences of failure."

Plaintiff's contributory negligence was so conclusively shown by the evidence that the court erred in not directing a verdict for defendant. Improvement Co. v. Munson, 14 Wall. 442, 448, 20 L. Ed. 867; Pleasants v. Fant, 22 Wall. 116, 120, 22 L. Ed. 780; Herbert v. Butler, 97 U. S. 319, 320, 24 L. Ed. 958; Montclair v. Dana, 107 U. S. 162, 2 Sup. Ct. 403, 27 L. Ed. 436; North Penn. R. R. Co. v. Bank, 123 U. S. 727, 733, 8 Sup. Ct. 266, 31 L. Ed. 287; Elliott v. Chicago, etc., R. R. Co., 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068; Union Pacific Ry. Co. v. McDonald, 152 U. S. 262, 282, 14 Sup. Ct. 619, 38 L. Ed 434; Southern Pacific Co. v. Pool, 160 U. S. 438, 440, 16 Sup. Ct. 338, 40 L. Ed. 485; Coughran v. Bigelow, 164 U. S. 301, 307, 17 Sup. Ct. 117, 41 L. Ed. 442; Patton v. Texas & Pac. Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361; Dist. of Columbia v. Moulton, 182 U. S. 576, 582, 21 Sup. Ct. 840, 45 L. Ed. 1237.

The judgment is reversed, with a direction to grant a new trial.

THAYER, Circuit Judge (dissenting). I am not able to concur in the view that the trial court should have instructed the jury, as a matter of law, that the plaintiff below was guilty of contributory negligence, and could not recover for that reason. As I construe the majority opinion, it is conceded that the evidence adduced at the trial tended to show, and that a jury might have found, that the defendant railroad company was guilty of negligence, such negligence consisting in running one of its trains, which was an hour behind time, through a village of considerable size, and across one of its main traveled streets, at a rate of speed approximating 50 miles an hour, without giving the customary warning signals of its approach, and without having a flagman at the crossing to warn people that a train was coming. Distressing accidents are very likely to occur when a train is run at such speed across the streets of a town, at grade, especially when the customary signals of its approach are not given

and flagmen are not at their posts of duty, so that the act complained of cannot be regarded otherwise than as one of gross negligence.

It is further conceded in the majority opinion that, as the plaintiff below approached the track from the north, his view to the west was obstructed so that it cannot be said that he was guilty of negligence in failing to see the approaching passenger train until he had reached the track, and was on the point of crossing it. Now, the plaintiff himself testified that when he reached the track he halted, and both looked and listened, as it was his duty to do; that his view to the west, the direction in which he first looked, was obstructed, except for a distance of about 175 feet, by a cloud of smoke on the track, which came from the pumping station; that after glancing to the west he looked east, from which direction a train was about due, and, not seeing any train in either direction, he then stepped on the track with a view of crossing it, when for the first time he heard the approaching train, and, turning, saw the engine emerging from the cloud of smoke which up to that time had obscured his view to the west. Thereupon he jumped back, but, owing to the speed of the train, was not able to get out of the way in time to avoid being struck by the engine. The majority of the court say that, in view of the situation, the plaintiff's testimony "is entitled to no credence, and does not create a conflict of evidence," for which reason it should have been disregarded, and the jury directed to find a verdict in favor of the defendant. I do not concur in that view. I think that this court has no right to disregard the plaintiff's testimony, and that it cannot do so without usurping the functions of the jury. In this class of cases it may at times happen that the testimony of a witness to the effect that he looked in a given direction and did not see an approaching train is so far at variance with the physical facts of the situation as to justify a court in disregarding it because if he looked he must have seen it. The case in hand is not of that kind. It is by no means impossible, or even improbable, that the plaintiff did look west along the track as far as his view would extend, and that he neither saw nor heard the approaching train, if it gave no warning of its coming. A cloud of smoke falling on the track on a dark lowering day such as that on which the accident occurred would naturally render a train invisible for a few moments to one standing where the plaintiff appears to have stood, although it may have been visible to persons standing elsewhere. Any one who has ever stood on a railroad track on a dark, cloudy day and observed the effect of a cloud of black smoke drifting across the track can well understand that this train may have been invisible to the plaintiff until it emerged from the smoke in the manner which he describes. The train was moving at the rate of 74 feet per second, which would enable it to cover the intervening space between the crossing and the point where the smoke was drifting across the track in about two seconds. Besides, it is not improbable that in the midst of other noises in and about the station, occasioned in part by the freight train which was moving on the adjoining track toward the crossing, the plaintiff did not in fact hear the coming train until it was almost upon him, and too late to get out of the way. In view of these considerations I agree with the

learned judge of the trial court that it was the right and the duty of the jury, rather than of this court, to say whether the plaintiff had given a truthful account of his conduct on the occasion in question, and, if they found in his favor, to say whether, in view of all the circumstances, he did not exercise that degree of care in crossing the track which a footman of ordinary prudence in his situation would have exercised. There is no evidence in this record that when the plaintiff started to cross the track he had any knowledge that the train from the west was belated, and had not passed the station. The plaintiff says that when he approached the crossing on the morning of the accident he did not know whether it had passed the station or not, but "guessed" that it had gone. He acted upon the assumption, therefore, that no train from the west was expected, and, hearing no warning signals, and finding no flagman at the crossing, he may have stepped on the track, which he could cross in a few seconds, with only a momentary glance to the west. Under such circumstances as these a momentary glance to the west would be all that a foot passenger could reasonably be expected to give before attempting to cross the track. At all events, it was the function of the jury to say whether he acted with ordinary prudence, or should have waited longer until the smoke cloud floated away, and studied the situation more carefully. Upon the whole, therefore, I conclude that it cannot be said that 12 reasonable men, listening to the testimony which is contained in this record, must have found that the plaintiff testified falsely, and that he went on the track heedlessly, without looking to the west or listening. Twelve jurors, acting under proper instructions, have in fact found to the contrary of this contention, and this court should not reverse that finding if the right of juries to determine issues of fact is to be further respected. I think the judgment below should be affirmed.