## THE NIMROD.

(District Court, S. D. Alabama. August 13, 1909

No. 1,203.

1. COLLISION (§ 11*)—NAVIGATION RULES—CONSTRUCTION—"STEAM VESSEL."
   Every vessel propelled by machinery is considered a "steam vessel," within the meaning of the navigation rules.
   [Ed. Note.—For other cases, see Collision, Dec. Dig. § 11.*
   For other definitions, see Words and Phrases, vol. 7, pp. 6654, 6655.]

2. COLLISION (§ 67*)—NAVIGATION RULES—CONSTRUCTION—"UNDER WAY."
   A vessel, although her headway is killed in the water, is considered "under way," and subject to the navigation rules, unless she is at anchor, or tied to the shore, or aground.
   [Ed. Note.—For other cases, see Collision, Dec. Dig. § 67.*
   For other definitions, see Words and Phrases, vol. 8, p. 7161.]

3. COLLISION (§ 39*)—STEAM VESSELS CROSSING—FAULT.
   The tug Nimrod left the wharf in Mobile, and when proceeding down the river, about the middle of the channel, ran down and sank a power launch, and the sole occupant thereof was drowned. When the tug approached, the launch was lying on the west of the channel, about 50 feet

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

from the course of the tug, pointed down the river, and was nearly motionless, until the tug reached a point 50 to 75 feet to the north of it, when it suddenly started ahead at a rapid speed on a course crossing that of the tug. The occupant of the launch was not at the wheel, gave no signal as required by the rules, having the tug on his port bow, and apparently paid no attention to the tug until immediately before the collision. When the launch started and changed its course, the tug stopped her engines: but there was not sufficient time to change her course or materially reduce speed. *Held,* that she was not in fault, but that the collision was due solely to the negligence of the deceased.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 39; Dec. Dig. § 39.*]

In Admiralty. Action by the administrators of A. Danenberg, deceased, against owners of the tug Nimrod, to recover damages for the death of libelants' intestate, in collision. Decree for defendants.

Webb & McAlpine and Leo M. Brown, for libelants.
Pillans, Hanaw & Pillans, for defendants.

TOULMIN, District Judge. This is a suit in admiralty, brought by the administrators of A. Danenberg, deceased, who is alleged to have been drowned through the negligence of the officers of the tug Nimrod. The suit is brought against the owners of the tug.

The libelants allege that the tug Nimrod left the foot of Dauphin street, blew a leaving signal, and proceeded down the river, and that the deceased, A. Danenberg, had not left Government street with his launch, but was in it heading in a southerly or southeasterly course; that he thence turned easterly across the river, and proceeded 50 or 75 yards. The tug was at that time about 150 feet up the stream northerly from the launch, and was approaching at a rate of 5 or 6 miles an hour. At that time Danenberg appeared to be having some trouble with his machinery used in the launch. Libelants further allege that the servants of the defendants, in charge and control of the tug, negligently failed to change her course or lessen her speed; that she gave no signal, by bell, whistle, or in any other manner, to warn Danenberg, until approaching within about 30 feet of the launch, when the pilot gave the first warning by calling to Danenberg, on which Danenberg turned his wheel in such way as to cause the launch to take a course downstream; that the speed of the tug was not lessened, and almost immediately after said Danenberg changed the direction of the launch the tug struck it, caused it to sink and Danenberg to be drowned. Libelants then aver that the collision could have been avoided if the pilot of the tug had given the proper signals, required by the regulations, in due time, and that the collision could have been avoided if he had changed the course of the tug, so as to have proceeded in a more easterly or southeasterly direction.

The death of Danenberg must have been caused by the wrongful act, omission, or negligence of the agents or servants of the defendants to render them liable therefor. The libelants charge that it was caused by the negligence of the master and pilot of the tug. The defendants deny that said master and pilot was guilty of any negligence in the

premises, and furthermore aver that the deceased, Danenberg, was himself guilty of negligence, in having no lookout or other helper on his launch, and in the improper manner in which he navigated and maneuvered his boat, which proximately contributed to the cause of his death.

After a very careful examination and consideration of the evidence, which, as is usual in such cases (cases of collision), is quite conflicting, I find from the weight of the evidence the facts of the case to be substantially these:

The steam tug Nimrod left the foot of Dauphin street, in the city of Mobile, about 2 or 3 o'clock p. m., on or about August 22, 1908, blew a leaving signal, and proceeded down the channel of the Mobile river; that Danenberg was at that time in his launch at the foot of Government street, on the same (west) side of the river, and two blocks below Dauphin street—perhaps some 900 feet—the launch heading north. Danenberg very soon started out from this position, turned his launch around, and headed in a southerly or southeasterly course, downstream. When in 50 to 75 feet west of the direct southern course of the tug, outside of and near to the west bank of the channel of the river, and well clear of the tug's course, his launch stopped. He appeared to be working with his engine, which was situated near the stern of the boat. The wheel was in the bow of the boat. The boat was variously estimated at from 18 to 25 feet long. Danenberg was alone on the launch. When the launch had stopped, and Danenberg was working with his engine, her bow was headed south. Danenberg was facing north; his back being towards the bow. At this time the tug was about 100 feet north of him, on a north and south line down which the tug was traveling and 50 to 75 feet east of where the launch had stopped. The launch was stationary, or slowly drifting down with the tide. Suddenly, when the tug was nearly abreast of her—probably 50 feet farther north, and 50 to 75 feet east—the launch started ahead, and circled or turned to the eastward, running at rapid speed in the direction of the course the tug was pursuing. The launch was a very smart boat, got off quickly when her engine started up, and going, as stated by one of the witnesses, "at a very rapid clip up until the collision."

At the time the engine started and the launch moved off, Danenberg was not at the wheel, and did not reach the wheel until the two vessels were very close together—said by some of the witnesses practically together. When Danenberg got to his wheel, he appeared to turn it hard to starboard, and succeeded in deflecting the course of the launch slightly to the south or southwest, but not sufficiently to avoid the collision. The launch received a glancing blow about 3½ to 4 feet aft her port bow; the blow on the tug being about the boilers, some 25 feet from the stem of her bow. The launch was not crushed or very badly damaged, but partly overturned and caused to sink, in which unfortunate accident Danenberg was drowned.

Charles Davis, a witness for libelants, testified that, when he first noticed the boats, they were 100 or 150 feet apart, both going down the river. The launch was westward of the tug, and not quite to the

channel, and the tug about the center of the channel. The launch finally got into the channel, and the collision occurred.

Hendrickson, who was a member of the tug's crew, and a witness for libelants, testified that, when he first noticed the launch, it was about 100 feet ahead of the tug, and looked to be going downstream; that she was out of line of the tug about 50 feet or so, and was about 100 feet to the south and off the tug's track. When he saw the launch, Danenberg was back at his engine, and when about 50 feet away the launch turned to southeast or east, and its course was then across the line, north and south, that the tug was traveling. This was immediately before the accident, and close to it.

Peter Forbes, the master and pilot of the tug, testified in substance: That, when he first noticed the launch, she was leaving the wharf about the foot of Government street. That she came out heading up the river, turned, and headed south. She seemed to break down; was to the side of the tug's course about 75 or 80 feet. She stopped a few minutes after she left the wharf. Danenberg was at the engine after she stopped. Just before the tug got abreast of her she started up, got under way, and turned to port or eastward; had been heading south. Danenberg was not at his wheel when the tug got there, and was not at his wheel when the two boats were near together, when witness holloaed at him. That he (witness) was at the wheel of the tug and never left it. When he saw the launch turning so as to bring on a collision, besides exclaiming, he rang the bell to stop the boat, and he put the helm to starboard, the effect of which is to throw the boat to port. The boat obeyed very little for want of time. That he did everything under existing conditions to avoid the collision. There were only a few seconds, and the whole thing was done. The launch was on his starboard bow. The tug had approached to within 75 or 80 feet of the place of collision when the launch got under way. This is estimated; it being hard to estimate distance on water exactly. He received no signal from Danenberg, before he started up, that he was going to start. The launch hit the tug about abreast the pilot house. The tug was not going over 6 miles an hour. He further testified that it is not customary to give signals to a vessel at rest in the position this launch was at the time. She was on the west side of channel. The tug was to the east of her, near the middle of the channel. After he headed south, and saw the launch coming out from the wharf, he could not say he lost sight of her. He was 75 or 80 feet north of the point of collision at the time the launch started up. He put his wheel to starboard to take the boat to the east, but could not, in the time he had, do so. The vessels were pretty near together then. The launch, when she started up, was going as fast, if not faster, than the tug, and it took but a few seconds for the tug to run 75 feet. That the first thing he did was to ring the bell to stop, then put the wheel to starboard, and this was before the collision. That he did not have space enough to go and to deflect either to the east or west of the launch. The engine of the launch started while she was bearing south, and she swept around towards the tug.

Forbes is corroborated as to many of the material facts stated by him by the witness Glidden, the engineer of the tug, who testified to

the ringing of the stopping bells; by August Lesin, deck hand on the tug; and Hendrickson, also a member of the crew of the tug. Lesin testified he first saw the launch lying head down the river, stopped; the tug was going down on the east side of her; launch a good distance off; also that Forbes put his wheel hard over, or tried to, but could not get it over quick enough to get clear; that he rang the bell to stop the engine, etc. Hendrickson says he thinks the stopping bell was rung just before the collision. He also says the engine was stopped, and the tug's speed was lessened, when the collision occurred.

Forbes is also corroborated by Peter Smith, a bar pilot in Mobile harbor. He was on the quarter deck of a schooner anchored in the river. He corroborates Forbes in his statement as to some of the material facts testified to by him, and also as an expert pilot is corroborative of Forbes. He is also corroborated by Bernard Anderson, a master and pilot of a steamer. He was on the wharf at the foot of Church street, about abreast of where the collision took place, and in view of it.

Witness for libelants, Curry, testified that the tug's engine was stopped at the time of the collision. Several other witnesses testify in harmony with the foregoing statement of the facts as found by me, more specific reference to which would unnecessarily extend this opinion now already too long.

As before stated, there is conflict in the evidence. Some of libelants' witnesses testify that Danenberg left the Government street wharf and went directly east across the river, but stopped shortly before he reached the channel, seeming to have some trouble with his engine. One of said witnesses stated that he stopped a short distance from the wharf, then started up, and he did not see him stop again, but ran at a rapid clip up to the time of the collision, going across the course of the tug, and was run into by the tug in so doing; that the tug did not change its course, did not lessen its speed, and that he heard no bell ring. Another of said witnesses stated that the launch was going across the river to the east, did not stop until she reached the channel, and was directly in the course or line of the route of the tug, and was "motionless" in such way when the tug ran down upon her; that the tug must have been 100 feet, more or less, from the launch at the time the launch reached the point where she lay motionless and the collision took place. The tug gave no signal and did not appear to change her course or slacken her speed; did not see the launch have any trouble with her engine starting out in the beginning. She went out very smoothly.

This witness is in conflict as to several of his statements, and particularly in that the launch was lying "motionless" directly in the path of the tug when she was struck, with every other witness in the case who testified on that point, except, perhaps, the witness Holmes. Holmes says, when the launch stopped, he noticed the tug north, coming down, distant something like 100 feet, more or less, and the launch was directly in the path of the tug. The witnesses for the libelants generally testify that they heard no signals given, that they heard no bells rung at or before the collision, and that the tug did not appear to lessen her speed or change her course at all.

On the part of the defense it is not claimed that there was any material change, if any deflection, in the course of the tug. The evidence in their behalf is that the stopping bell was rung and the engine stopped, and that evidence tends to show that there was not space and time enough to stop the tug, or materially lessen her speed, from the time the "risk of collision" appeared to the time the collision occurred. Most of the witnesses, who testified favorably to the defense, as to the ringing of the stopping bell and stopping the engine, and to the attempt of the pilot to starboard the wheel, "were in a situation favorable for observation and who testify affirmatively and positively to the occurrence," while the evidence of the libelants on that point is purely of a negative character. Chicago Ry. Co. v. Andrews, 130 Fed. 65, 64 C. C. A. 399; B. & O. R. Co. v. Baldwin, 144 Fed. 53, 75 C. C. A. 211.

Rule 9 of the pilot rules provides that:

"When two steamers are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steamer is overtaking another, the steamer which has the other on her own port side shall hold her course and speed; and the steamer which has the other on her own starboard side shall keep out of the way of the other, by directing her course to starboard so as to cross the stern of the other steamer, or, if necessary to do so, slacken her speed or stop and reverse. The steamer having the other on her own port bow shall blow one blast of her whistle as a signal of her intention to cross the bow of the other, holding her course and speed, which signal shall be promptly answered," etc.

The launch is a steam vessel. Every vessel propelled by machinery is considered a steam vessel. Act Jan. 18, 1897, c. 61, 29 Stat. 489 (U. S. Comp. St. 1901, p. 3029); Hughes on Admiralty, p. 216. "And a vessel, even though her headway is killed in the water, is considered under way, unless she is at anchor, or tied to the shore or aground." Hughes on Admiralty, p. 216.

The contention of the libelants is that, when Forbes saw Danenberg go back to his engine, he should have slackened the speed of the tug, or stopped, or reversed. This contention must be based on the theory that the two steamers were approaching each other at right angles or obliquely, so as to involve risk of collision. This is clearly the libelants' theory as contended for on their evidence.

Under rule 9, supra, the steamer having the other on her own port bow shall blow one blast of her whistle as a signal of her intention to cross the bow of the other, holding her course and speed, which signal shall be promptly answered by the other steamer by one short blast, etc. In this case we find the launch, having the tug on her own port bow, should have blown one blast of her whistle as a signal of her intention to cross the bow of the tug, holding her course and speed, which signal was to be promptly answered by the tug. Until such signal was given no obligation rested on the tug to answer. There is no proof that the launch gave the required signal. It is to the contrary.

If it be conceded that the tug was running at an unlawful rate of speed, or was in fault for violating any of the navigation rules, and the death of Danenberg was the result of the combined negligence of both the tug and launch, there can be no recovery. Mooney v. Car-

ter, 152 Fed. 147, 81 C. C. A. 365. The rigid doctrine of the common law as to contributory negligence applies in such cases. Hughes on Admiralty, p. 208.

Article 29 of the regulations for preventing collisions upon certain rivers and inland waters of the United States, provides that:

"Nothing in these rules shall exonerate any vessel, or the owner or master thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required  *  *  *  by the special circumstances of the case." Act Aug. 19, 1890, c. 802, 26 Stat. 320, § 1 (U. S. Comp. St. 1901, p. 2871).

"It is said that rules of navigation are only intended to apply when vessels are approaching each other in such directions 'as to involve risk of collision.' *  *  *  The mere fact that vessels are in sight of, or even near, each other, navigating the same waters, does not bring these enactments into play. If their courses are parallel, and sufficiently far apart to clear with a safe margin, *  *  *  there is no need for rules of navigation." Hughes on Admiralty, p. 233.

"If two vessels are moving on courses that, if held, would pass clear, then there is no risk of collision, and no rule is necessary." Hughes on Admiralty, p. 238, and authorities cited.

In my opinion the weight of the evidence in this case clearly establishes these facts, namely, that the launch was lying outside of and west of the channel, heading south down the river, drifting but little, if any at all; that the tug was 100 or 150 feet north, coming down the channel of the river on a direct course at least 50 feet east of the position of the launch; that the launch started up, turned eastward, and approached the channel at a fast rate of speed, and that Danenberg was not at his wheel; that the courses of the two vessels, as indicated at the time the launch was lying idle and started up, were sufficiently far apart for the tug to clear her with a safe margin; that no "risk of collision" between the two vessels was involved until the launch started up, turned to the eastward, and proceeded at a rapid speed towards the channel, down which the tug was approaching at a rate of speed of at least 6· miles an hour; that at the time the launch started up and turned eastward the tug was from 50 to 75 feet north, and about the same distance on a line east, on her course down the channel; that no signal was given by Danenberg, indicating his intention to change his course from that which the position of the launch indicated he was going, at the time he started his engine and got in motion.

My opinion further is that Danenberg neglected precautions which were required by the special circumstances of the case. He is presumed to have known the unreliability of the kind of engine that he was using, which the evidence tends to show it was, and he neglected to have a proper lookout, or any one on his launch with him to aid him in her navigation. From my view of the evidence, I am of opinion that the claimants are not entitled to recover. Although Danenberg may have been negligent in failing to have a proper lookout, and have been negligent in starting his engine, putting his launch in motion and running at right angles or obliquely towards the course of the tug, under the then existing conditions, yet if the pilot of the tug had been guilty of wantonness, that is, was so recklessly indifferent to Danenberg's peril as to have consciously failed to use all means at hand to have

avoided the unfortunate occurrence, as contended by libelants' counsel, my decision in this case would be different. But I find from the decided weight of the evidence no ground for such contention.

My conclusion is that the claim of the administrators of A. Danenberg, deceased, must be disallowed and dismissed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes