### NORTHERN PAC. RY. CO. v. ALDERSON et ux.

(Circuit Court of Appeals, Ninth Circuit. October 7, 1912.)

#### No. 2,062.

1. EVIDENCE (§ 116*)—CHANGED CONDITIONS SUBSEQUENT TO ACCIDENT—LIMITATION.

Where, in an action for injuries at a railroad crossing, both parties introduced photographs of the location, is was not error for the court to admit evidence that the alleged obstruction to a view of the track from the public road had been cut away by the railroad company subsequent to the accident; it being limited by an instruction that the jury should consider it only to explain the photographs.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 134, 135; Dec. Dig. § 116.*]

2. RAILROADS (§ 327*)—CROSSING ACCIDENT—CARE REQUIRED.

Travelers on a public highway, approaching a railroad crossing, are required to use their senses of sight and hearing to detect the approach of trains, and, when the track is obscured to the sight, greater care is devolved on them in the use of the sense of hearing, and in listening they must be so disposed as probably to listen effectively; otherwise, still greater care should be observed by not venturing on the track until it is ascertained that it will be clear, especially if trains are frequently passing.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1043–1056; Dec. Dig. § 327.*]

3. RAILROADS (§ 350*)—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE.

In an action for injuries in a railroad crossing accident, whether plaintiffs were negligent in approaching the crossing *held* for the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152–1192; Dec. Dig. § 350.*]

4. RAILROADS (§ 350*)—CROSSING ACCIDENT—QUESTION FOR JURY—PHOTOGRAPHS.

In an action for injuries at a railroad crossing, photographs taken at various points along the highway approaching the crossing, showing the view of the track in the direction from which the train approached, were

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

not conclusive evidence that the situation was one of unobstructed view, since, without proof showing the viewpoint of the photographer, his distance from the scene, and the direction in which the camera was pointed the photographs were valueless for evidential purposes, and, such proof having been given, its weight was for the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152–1192; Dec. Dig. § 350.*

Photographs as evidence in civil actions, see note to Porter v. Buckley, 78 C. C. A. 145.]

In Error to the Circuit Court of the United States for the Eastern Division of the Eastern District of Washington.

Action by George Alderson and wife against the Northern Pacific Railway Company. Judgment for plaintiffs, and defendant brings error. Affirmed.

This is an action to recover damages for personal injuries sustained by Mrs. Cora C. Alderson, one of the defendants in error, and a child, through the alleged negligence of the plaintiff in error, and also damages for the loss of a team and the wrecking of a wagon. For convenience, the parties will be referred to as they were entitled in the trial court.

At the time of the accident complained of, the plaintiffs, Alderson and wife, with two children, were riding in a wagon drawn by a span of horses, and traveling east on a public highway which crossed the track of the railroad; the track running somewhat in a northeasterly and southwesterly direction. In approaching the track from the west, a view of it could be had from a hill or small elevation some 100 yards distant. From the hill the road descends to a bridge, the eastern end of which is in the neighborhood of 180 feet from the track. George Alderson, the husband, was driving. The seat was on springs above the bed of the wagon, and the occupants rested their feet on the dashboard in front. Alderson was sitting on the right; his wife on the left, with a babe in her arms. The other child was riding in the wagon bed. As they attempted to drive across the railroad track, an engine drawing a train of passenger coaches, coming from the north, collided with the team, killing the horses, overturning the wagon, and injuring Mrs. Alderson and the child riding in the wagon bed. There were brush and high weeds growing along the roadway on the north side, extending from the east end of the bridge toward the railroad track; also along the railroad track from the roadway northward.

Alderson describes the manner in which the accident came about in substance as follows: That, in driving east, he came to the top of the raise west of the bridge; that from there they were in plain view of the track, and he looked both ways, and saw no indication of any train; that he came to the bridge, and at a point just as they were leaving it, but without stopping, he looked both ways and listened, and saw no train in either direction, nor did he hear any; that he drove on to within 20 to 30 feet, from where he was sitting in the wagon, of the railroad track, and stopped, and, not being able to see through the brush that had been allowed to grow up on the right of way, listened, and looked both ways; neither hearing nor seeing any train, he drove on, and just as his horses' fore feet stepped over the track, the first rail, he saw the train coming into the gap, 50 feet from the crossing; that he pulled back on his lines, but the engine struck the horses, doing the damage complained of; that no whistles were blown nor alarm given, except that the engine gave two little squeaks—an attempt to whistle—just as it struck the team. The team is described as moving at a smooth walk at the time. Alderson further testifies that just as one passes off the bridge there is an open space through which a plain view could be had for miles either way, but that the brush extended from there up to within 10 feet of the railroad track, completely obstructing the view to the north, the direction from which the train came; that he knew the schedule time of the train, and it was late in passing.

Mrs. Alderson describes the experience thus: "After we crossed the bridge —when we came to the bridge, we could see through the bushes there. There is a little space there, and we could see through the bushes there; but we couldn't see no train, and we listened and looked both ways, and couldn't see no train. We went on about 20 to 25 feet, when we stopped there and looked both ways and listened; and we didn't see no train nor hear any, and we ventured on. We got the horses right to the track, and the fore feet over the track, when I noticed the train. I kept looking all the time, and I said: 'There's the train.' I didn't say that, excuse me; I said, 'Back'—that's the words—I said, 'Back,' and I went as high as the car. I seen the top of the car, and that's the last I remember." She further states that she kept looking along there, but did not see the train until it came to the cattle guards, which was the first time she could see it; that the trees and bushes and things extended up to within 10 to 12 feet of the railroad track, and up the track a quarter of a mile, and that these obscured their vision until they drove on the track. On cross-examination, she says they stopped within 20 to 30 feet of the track, and looked both ways and listened, and that she kept looking all the time, and saw nothing of the train until the horses' feet were on the track, and could hear nothing.

Dwinnell, a witness who was at the time in a field to the south of the public road, and a little east of the railroad track, testifies that he saw Alderson come down the road, and saw the train coming; that he was in plain view of both; that when Alderson came down and crossed the bridge, and had proceeded, according to witness' judgment, halfway to the railroad track, he halted his horses; that witness then turned east, and when he had gone two or three steps his attention was attracted by three short whistles of the engine, and, looking about, he saw Mrs. Alderson fall away from the wagon; that he heard no signal or warning whatever from the train until the three whistles were given as the collision took place; that at the time of the accident trees and brush were growing along the road and along the railroad right of way, and that "from where Mr. Alderson was he couldn't see anything; if he had been right at the track he could"; and that the brush came up within less than a rod of the track, in his estimation. On cross-examination, witness further states that, according to his judgment, Alderson was about halfway between the bridge and the railroad track when he stopped. Witness is sure that from where they stopped they could not see anything of the train—they could not see it through the brush; that they could see the train, if they were right up near the track, but they would have to get "right almost on the crossing" to do it.

Other witnesses corroborate these as to the trees and brush growing along the roadway and the railroad right of way, and as to the inability of persons traveling upon the public road at the time to see an approaching train coming from the north until very near the railroad track. Other testimony was also adduced tending to show that the engine gave no signal or warning of its approach to the road crossing, except the whistles given right at the time of the collision.

For the defense there was offered a series of five photographs, taken with the camera at the height of about 4 feet 6 inches from the ground. The first of the series was taken from a point in the center of the wagon road, 30 feet from the railroad track, looking towards the track. Two men can be seen on the track 720 feet north of the crossing. The second was also taken in the center of the wagon road, but 40 feet from the track, looking towards the east. The two men can be seen on the track to the north 900 feet distant. The third was taken 50 feet distant, looking back across the track. It shows the track back as far as the cattle guard north, which would be perhaps 50 feet from the road. The fourth presents a view with the camera a little farther away, and looking northeasterly. In this picture, also, are shown two men on the track, 900 feet north of the crossing. The fifth was taken from a position down the track 80 feet from the crossing, looking northward along the track. Such is, in effect, the testimony respecting the taking of these photographs. From a scrutiny of the photographs, it would appear that, from the wagon road as one approached the

track, for more than 30 feet westward, there was a clear view of the track looking northward.

George Howe, the locomotive engineer on the train, testified: "I whistled for the crossing at about the regular place, perhaps a little bit below, because our crossing whistling post is in a little close to the crossing, and when about, I should judge, halfway between that distance, I saw the team that came through a little gap that there is in the willows there, and that would perhaps leave me off 600 or 700 feet from the crossing, and I couldn't tell whether there was anybody in the wagon or not. I could see the team and wagon traveling through this little open space, and for fear that they didn't hear me I reached up and give just a little crossing whistle, to simply call their attention before they would come out from behind the second clump of bushes. It wasn't a loud whistle; it was just an ordinary crossing whistle, which would consist of four low whistles; and at about the time I had blowed that whistle I saw the horses' heads come out around the second clump of bushes, which would leave them, I should judge, about 40 feet from the track. Well, I was sure that they didn't see me, or else it was somebody that was going to be kind of smart, and drive up close to the track; but in order to warn them thoroughly, I reach up to open the bell ringer, but whether it rung I could not swear, because it happened so quick; but I took, and instead of letting go of the whistle, I commenced to whistle short successive blasts of the whistle, and when the team got within about 10 feet of the track I saw him, and I guess it was his wife, both looked up at me in this manner (illustrating), when the horses' heads were within I should judge about 10 feet from the track, and, instead of stopping, he reached over with the lines, they were slack, and commenced to whip his horses up. I commenced to whistle louder then, and at that time put on the emergency air to stop as quick as I could. I was perhaps 50 feet from them when I applied the air brakes—the full emergency. When he seen he couldn't get across, he stopped his horses and tried to back, as I judge, and swing them around to the right, and I struck the left horse on the shoulder. That's the last I seen, because I dodged back behind the boiler head, because I didn't know what would hit —because there is danger of things coming in through my window. I stopped as soon as I could, and went back and helped them." The train, in the judgment of witness, was going about 35 miles an hour. The whistling post is about 80 rods from the crossing, a little beyond which the track curves to the right looking northward. On cross-examination, witness states that he had always whistled for the crossing since he had been on the run, but that he forgot it sometimes. He was positive that he did not forget to whistle at this time. He testifies that he whistled again, a low crossing whistle, within 100 to 150 feet from the crossing, and then commenced to blow the successive whistles, which continued up to the collision. When he saw the team and gave the crossing whistle, they were 60 feet or more from the track, and the next time he saw them the horses' heads were "just coming from behind this second clump of bushes," and, according to his judgment, the bushes were at least 40 or 50 feet from the track. It was then that he began sounding the danger signal.

The conductor, W. E. Preston, heard only the alarm signal, and, looking out, first on one side of the train and then on the other, saw the wreck.

The brakeman, James L. Bates, was sitting in the smoking car, and heard the short blasts of the whistle sounded at intervals and a light application of the brakes, that being about three or four telegraph posts from the crossing, in his estimation 600 feet, from the crossing. He then walked to the rear of the car, got down on the step, and by that time the train had passed the crossing. When he opened the door and looked back, he saw the team, which had been struck by the engine. On cross-examination the witness says: "When he blew the first blast of the whistle. I sat at the window like this (illustrating) and looked out, expecting to see some stock; but he kept it up, so I went to the vestibule and opened the door and looked out."

The fireman, Dave White, was not sure that the engineer blew a whistle at the whistling post, but heard a whistle before they got to the crossing. He next heard a short alarm, and, seeing the engineer apply the emergency air, he looked out, but by that time they had hit the team.

II. L. Rogers, the express messenger on the train, says: "I heard only the sharp blasts of the whistle, the cattle alarm signal, the stock signal, and I didn't pay very much attention to it until he continued with it, and I ran to the door, the side door, of the express car, * * * and as I got to the door I saw the team and wagon rolling away from the locomotive."

Louis C. Greenwood testified that he saw the place on the day of the accident, and then again on July 4th, two days thereafter, and that no change had taken place in the meanwhile. He further states that he had examined the place before that, and that the way was clear from the track to the telephone post westward, and some distance beyond—in his estimation, from 30 to 40 feet from the track. He saw the situation again in October, or some time after the accident, and the brush had been cut away.

Louis De Clark, the section foreman, testified that he was present on July 6th, when the photographs introduced by defendant were taken, and that there had been no change in the situation—no brush cut, or anything else, previous to that. He further testified that, in running down the track on a hand car, one could see a team for 40 or 45 feet before it got to the track.

A great deal of other testimony is to be found in the record; but this suffices to show its tendency, as bearing upon the questions of fact submitted to the jury for its consideration.

Edward J. Cannon, G. M. Ferris, and C. E. Swan, all of Spokane, Wash., for plaintiff in error.

W. H. Plummer and Henry Jackson Darby, both of Spokane, Wash., for defendants in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). [1] The first question insisted upon by counsel for defendant is that the court erred in permitting the plaintiffs to show that the alleged obstruction to the view of the railroad track from the public road had long subsequent to the accident been cut away by the railroad company. There was some evidence to that effect allowed to go to the jury, but it was neither offered nor received as an implied admission of the defendant's negligence in relation to the injury sustained by the plaintiffs. The first evidence of the kind was in relation to a photograph of the location offered by plaintiff, and it was to explain the photograph as compared with the condition at the time of the accident. And again, De Clark was cross-examined as to whether he had not cut the brush away in October—after he had said as much in his examination in chief. The trial court carefully charged the jury at the time that the fact that the railroad company may have cut the brush away after the accident was not material, and could have no bearing, directly or indirectly, except to explain in some manner the photographs taken. So that the court very carefully guarded the point at issue, and committed no error in the respect complained of.

[2] It is next contended that the trial court should have instructed the jury, as a matter of law, that the plaintiffs were not entitled to recover. The contention seems to be based upon two theories. One is, assuming that the obstruction to the vision existed, as plaintiffs claim, preventing them from seeing an approaching train from the north until within a few feet of the track, then that plaintiffs were guilty of contributory negligence in not observing ordinary care and

precaution in approaching the crossing. The track being obscured, it is urged that greater care would be required of the plaintiffs than if it were in plain view; in other words, that the care required to be observed is in proportion to the danger to be anticipated.

It is undoubtedly true that travelers upon the public highway, approaching a railroad crossing where passing trains are to be expected, are required to use their senses, of both seeing and hearing, to detect the approach of such trains, and that, when the track is obscured to the sight, greater care is devolved upon them in the use of their sense of hearing, because the capacity for detecting the danger has been diminished. In listening, they must be so disposed as probably to listen effectively; otherwise, still greater care should be observed by not venturing upon the track until it is ascertained that it will be clear —especially if trains are passing frequently. Chicago & N. W. Ry. Co. v. Andrews, 130 Fed. 65, 73, 64 C. C. A. 399; Chicago, M. & St. P. Ry. Co. v. Bennett, 181 Fed. 799, 104 C. C. A. 309.

[3] Alderson and wife say that the railroad track was obscured, by trees, brush, and weeds, from near the east end of the bridge in the roadway to within 10 or 12 feet of the track. That imposed upon them the precaution of stopping within a short distance of the track and listening for an approaching train. They say, also, that they could see the track from the little hill beyond the bridge, and again as they came off the bridge, and that at each of such points they looked both ways to ascertain if a train was approaching the crossing. Alderson knew the train passing south was late on its schedule time, which enjoined upon him special care, because anticipating that it might be along at any moment. Having passed beyond the range of view from near the bridge, both Alderson and Mrs. Alderson say they stopped within 20 to 25 or 30 feet of the track and listened for a train; hearing none, they drove upon the track. Dwinnell testifies that they stopped, he thinks, about halfway between the bridge and the track; that he turned to walk in a different direction, and that almost immediately he heard the short whistles, and then came the collision.

Stopping from 20 to 30 feet from the track would seem to be not too great a distance to listen effectively for the train; the noise of the wagon and clatter of the horses' feet having ceased. It does not appear that there were any other noises to drown the rumbling of the train. Alderson and wife having sworn that they stopped within that distance from the track, although in a measure contradicted by Dwinnell, it was for the jury to determine as to their credibility, and, furthermore, to determine, under proper instructions, about which there is no controversy, whether they used ordinary care, such as a person of ordinary prudence would exercise, in approaching and attempting to cross the railroad track at the time. We think, under the testimony, the care and prudence with which Alderson and wife approached the track before driving upon it was clearly a question for the jury, and it was not error for the court to leave it to them. This as it respects counsel's theory of an obstructed vision.

[4] Counsel's other theory is that plaintiffs' view of the railroad

track looking northward, from whence the train was approaching, was not obstructed at all for a distance of from 30 to 45 feet from the track, and that it was sheer negligence for them to drive on the track when they could readily have seen the moving train. It is argued with much earnestness that the series of photographs introduced by the defendant proves beyond controversy the situation of an unobstructed view, and therefore that a verdict for defendant should have been directed by the court. A scrutiny of these photographs would seem to indicate that there was an unobstructed view of the track, as claimed. Pictures, however, in themselves, like maps and diagrams, prove nothing without the human equation behind them. Says Mr. Wigmore:

"We are to remember, then, that a document purporting to be a map, picture, or diagram is, for evidential purposes, simply nothing, except so far as it has a human being's credit to support it. It is mere waste paper—a testimonial nonentity. It speaks to us no more than a stock or a stone. It can, of itself, tell us no more as to the existence of the thing portrayed upon it than can a tree or an ox. We must somehow put a testimonial human being behind it (as it were) before it can be treated as having any testimonial standing in court. It is somebody's testimony or it is nothing." 1 Wigmore on Evidence, § 790. p. 893.

And likewise the court, in Baustian v. Young, 152 Mo. 317, 323, 53 S. W. 921, 922 (75 Am. St. Rep. 462), in speaking of the probative effect of photographs, says:

"They are of the same character of evidence as diagrams and pictures drawn by hand; not necessarily carrying the same degree of probative force, but still of the same character; not in themselves evidence at all, but representing to the eye what the witness declares was the real appearance of the thing at the times he saw it. Diagrams, drawings, and photographs are resorted to only because the witness cannot, with language, as clearly convey to the minds of the court and jury the scene as the light printed it on the retina of his own eye at the time of which he is testifying."

In order to understand the photographs perfectly, it is necessary to get the viewpoint of the photographer, his distance from the scene, and the direction in which the instrument was looking; and it is here that the "human being's credit" supplements the picture. So we have, as a factor for the jury's consideration, the credibility of the witnesses who took or assisted in taking the pictures. And there is yet to be considered, along with these pictures and the human testimony that qualifies them as evidence, the testimony of other persons on the ground at the time, who observed as well the physical facts and their credibility. The plaintiffs, and several others corroborating them, say that the track was obscured up to within 10 or 12 feet of it. The witnesses behind the photographs say that it was not obscured for a distance of some 30 to 45 feet from it as one approached on the public road; and thus is presented a direct and irreconcilable conflict in the testimony. Such a case is generally, if not always, a proper one for the jury. It is not an unreasonable inference, deducible from some of the defendant's witnesses, that but one whistle was sounded by the engineer, which was the alarm signal, and that the collision came very soon thereafter. If the team had been sighted by the engineer, as he testifies, it would seem that he would have sounded a warning much

sooner. In this there is some corroboration of the plaintiffs' testimony upon the subject.

Upon the whole testimony, we are of the opinion that the case was properly submitted to the jury.

Affirmed.