RININGER et al. v. PUGET SOUND ELECTRIC RY. et al.

(Circuit Court of Appeals, Ninth Circuit. February 15, 1915.)

No. 2450.

1. APPEAL AND ERROR ⊂⇒403—PARTIES—AMENDMENT.

Under U. S. Comp. St. 1901, p. 714, § 1005, authorizing the allowance of an amendment of a writ of error when the statement of the title or parties in the writ is defective, if the defect can be remedied by reference to the accompanying record without prejudicing or injuring defendant in error, where a motion for judgment by one of the defendants was granted without objection, and such defendant was not named in the writ of error or citation, or made a party to the proceedings taken by plaintiffs to review a judgment in favor of the other defendant, plaintiffs will be permitted to amend the writ of error and citation by inserting the name of such defendant, and to substitute a new and amended appeal bond, conforming to the amended writ of error and citation, and a motion to dismiss the writ of error will be denied.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2115–2119; Dec. Dig. ⊂⇒403.]

2. RAILROADS ⊂⇒350—ACTIONS FOR DEATH—QUESTIONS FOR JURY.

In an action for the death of a person riding in an automobile, struck by an electric interurban car at a crossing, evidence as to the speed of the car and of the automobile, and as to whether an alarm gong was ringing, and whether deceased and his chauffeur looked and listened for approaching cars, *held* to make questions for the jury as to defendant's negligence and deceased's contributory negligence.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152–1192; Dec. Dig. ⊂⇒350.]

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Edward E. Cushman, Judge.

Action by Nellie M. Rininger and another against the Puget Sound Electric Railway and another. Judgment for defendants, and plaintiffs bring error. Reversed and remanded.

H. H. A. Hastings and L. B. Stedman, both of Seattle, Wash., for plaintiffs in error.

James B. Howe and Hugh A. Tait, both of Seattle, Wash., for defendants in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge. This action was brought by the plaintiffs in error against the defendants in error to recover damages resulting to them from the death of the husband of Nellie M. and the father of Helen Dorothy Rininger, which was in the complaint alleged to have been caused by the joint negligence of the defendants in error. The deceased Rininger was killed by a car of the defendant electric railway—an interurban road—colliding with an automobile in which he was riding. Both companies were represented in the court below by the same counsel.

[1] At the trial, upon the conclusion of all of the evidence on the part of the plaintiffs, the defendant Puget Sound Traction, Light & Power Company moved the court for judgment in its favor, "on the ground that it had been in no way connected with the ownership or operation or management or control of the interurban railroad, and that no negligence on its part had been shown." The record shows that that motion was granted as to that defendant without objection, and it was not named in the writ of error or citation, or in any way made a party to the proceedings taken by the plaintiffs in error to review the judgment which was subsequently entered by the court below in favor of the electric railway company, in consequence of which the latter company has moved for the dismissal of the writ of error.

To meet that motion the plaintiffs in error asked leave to amend the writ of error and the citation issued in the cause by inserting the name of the traction, light and power company as a codefendant in error with the electric railway company, and also for permission to substitute for the original appeal bond a new and amended bond to conform to such amended writ of error and citation, on the ground that the traction, light and power company was inadvertently omitted from the original writ of error and citation. The latter motion is granted, and the former one denied. Section 1005, U. S. Compiled Statutes 1901, p. 714; T. W. Teel v. Chesapeake & O. Ry. Co. of Virginia, 204 Fed. 914, 123 C. C. A. 210; Gilbert v. Hopkins, 198 Fed. 849, 117 C. C. A. 491; Walton v. Marietta Chair Co., 157 U. S. 342, 15 Sup. Ct. 626, 39 L. Ed. 725; Estis v. Trabue, 128 U. S. 225, 9 Sup. Ct. 58, 32 L. Ed. 437.

[2] After the elimination of the traction, light and power company the trial proceeded against the electric company, both parties thereto introducing much evidence, upon the conclusion of all of which the defendant company moved the court for a directed verdict in its favor, which motion was granted, and such verdict accordingly rendered by the jury. That action of the trial court is the matter for consideration here upon the merits. In granting that motion the court based its ruling mainly upon the decision of this court in the case of Northern Pacific Ry. Co. v. Alderson, 199 Fed. 735, 118 C. C. A. 173, and the decisions of the Circuit Court of Appeals of the Eighth Circuit in the cases of Chicago & N. W. Ry. Co. v. Andrews, 130 Fed. 65, 64 C. C. A. 399, and Chicago, M. & St. P. Ry. Co. v. Bennett, 181 Fed. 799, 104 C. C. A. 309. The evidence in each of those cases was very different from that in the present case.

This accident occurred at the crossing by the electric company's tracks of a macadamized highway at a place called Riverton, some miles south of the city of Seattle—the interurban electric line being that connecting Seattle with Tacoma. The plaintiffs in the case introduced evidence tending to show that over the highway at the crossing in question there is and was at the time a very large amount of travel, and also evidence going to show that about two miles southerly of Seattle the roadbed of the electric company, which is double-tracked beyond Riverton, crosses the Duwamish river, then passes a point called Quarry, then a little further south a place called Allentown, and

that about 1,200 feet still southerly of Allentown is the town or settlement of Riverton. From Quarry to Riverton the defendant company's tracks are constructed on a curve and at the foot of a high bluff, in places 44 feet high, until it approaches within 120 feet of the highway at Riverton, when it gradually recedes and disappears there. About 120 feet west of the west rail at Riverton, and about 17 feet north of the center of the highway, the defendant company had erected an iron post about 12 feet high upon which is an electric alarm gong about 12 inches in diameter, and on the top of which post are a series of red electric lights and a large railroad crossing sign; 1220 feet north of the crossing and on the company's west rail is an electric mechanism so constructed that a south-bound car cuts in the current and ordinarily sets the gong to ringing and lights the red electric lamps, for the purpose of warning travelers on the highway of the approach of a south-bound car or train. About 20 feet south of the crossing is another electric mechanism that cuts out the current from the gong and lights, causing the gong to cease ringing and the lights to be extinguished. A similar mechanism is constructed on the east rail of the company in inverse position, being operated similarly by north-bound cars. There was evidence given tending to show that under ordinary conditions the gong, when in operation, could be heard from 700 to 800 feet; one witness testifying that on a clear day it could be heard from 1,200 to 1,500 feet. There was testimony also tending to show that the curvature of the bank of the bluff was such as to deflect the sounds and warnings of south-bound cars toward the east, and that in consequence it was and is difficult for one at or near the Riverton crossing to hear the rumble or sounds of a south-bound car until it was practically at the crossing. There was also evidence tending to show that from a point 300 feet west of the crossing the highway descends towards it at about a grade of 4 per cent. until it reaches within 15 or 20 feet of the track of the railway company, when it becomes level until the railway track is crossed, and that from such point to the crossing a south-bound car following the west track around the curve could not be seen after it leaves Allentown until within 40 or 50 feet of the crossing.

At the time of the accident the deceased, who was a physician, was being driven by his chauffeur, and was sitting on the front seat with him, there being two ladies on the rear seat. They were approaching the crossing from the west, and consequently going towards Seattle. There was undoubtedly testimony on the part of the defendant company tending to show that the car that killed the deceased was not approaching the crossing at an immoderate speed, and that the alarm gong there was ringing, and that the gong upon the car was ringing, and that the deceased was being driven towards the crossing at an immoderate speed—some of the witnesses stating it as from 30 to 35 miles an hour—and consequently tending to show that the deceased was guilty of contributory negligence. And the court below so held, in effect, in taking the case from the jury and directing a verdict for the defendant. But in view of the evidence on behalf of the plaintiffs we are clearly of the opinion that the court below was in that regard in error.

It will be sufficient to cite a little only of the testimony given on behalf of the plaintiffs. The testimony of the chauffeur—Kent Brodnix—is in part as follows:

"My name is Kent Brodnix, and am an automobile driver and repair man, having followed this business seven years, and was following this business in July, 1912, and was then employed by Dr. Rininger, the deceased mentioned in this case. Dr. Rininger at that time owned a Sterns, and I had been driving it a few days over three months prior to July 25, 1912. To a certain extent at that time I was familiar with this crossing known as the Riverton crossing. During the afternoon of July 25, 1912, Dr. Rininger, the nurse, Miss Davis, and the doctor's sister, Miss Rininger, and myself had been to Kent. We were on our way back to Seattle, and approached this crossing a few minutes after 4 in the afternoon. As I was coming along as usual, and when I got to the top of this grade, possibly 300 feet back from the crossing, as I always had done before, I released the engine from the machine and started coasting down this grade, using the brake to control the machine, and I got down almost to the store, and I looked to the south to see if there were any trains approaching from that way and then looked towards the north, and I could not see any there. We were going about 15 or 16 miles an hour, not to exceed that. As I looked to the north, I did not see any car, and I let the machine come on down, and I looked to the south again between the freight house and the store, and then turned and looked to the north again, and the car was only a short distance from the crossing. I mean by this the Interurban car. Before this I had made an effort to listen to ascertain whether there was any car approaching. I heard no sound at all of any approaching car. I did not hear any whistle or the ringing of any bell on the car. Q. Do you know whether the doctor himself made any effort to ascertain if there was a car approaching? A. Yes. Q. Now you may state to the jury what you saw the doctor do, what efforts, or what the doctor did in respect to ascertaining. A. He looked both ways. Q. When you say both ways, what do you mean? A. To the north and to the south. Q. And did he indicate to you as to what should be done? A. Well, he gave the customary signal to go ahead. Q. At that time, as you were approaching, or at the time you saw the electric car approaching, was the electrical alarm ringing? A. Not that I heard. As soon as I saw the approaching electric car, I set the brakes and locked both rear wheels, and allowed the machine to stop as quick as possible. We were in the neighborhood of 25 to 30 feet west of the west track when I first saw the electric car. After I had set the brakes of the auto, both rear wheels skidded. I was able to bring the auto to a standstill before the electric car came along. The speed of the electric car, I should judge, was from 40 to 45 miles an hour. The motorman was not slowing down the approaching car that I noticed. I should judge the electric car was from 100 to 150 feet away when I first saw it. The electric car struck the front end of the automobile. Q. What happened? A. It picked the machine up and threw it back from the track about 35 feet and almost completely turned it around. The doctor and the other two occupants were thrown from the machine, but I was not, as I was behind the steering wheel, which prevented me from being thrown. The doctor was thrown into the front trucks of the car and dragged, I should say, about 50 feet, and was killed. The doctor's sister was thrown just to the side of the track, and Miss Davis was thrown clear through the cattle guard. Referring to Exhibit 10, we came along in the customary manner to the top of the hill, which was somewhere near the point marked 'J,' where I pushed the clutch out of the engine. Pushing the clutch out disconnects the car with the engine. This was a downgrade, and then the machine moved along of its own weight. Bearing in mind that this plat is drawn to a scale of 30 feet to an inch, I would say that when we first saw the electric car it would be at a point on this map one inch from the west rail of the west track. Just about one inch back up the highway. We were about 300 feet back when I disengaged the engine from the clutch, and did not connect the clutch again with the engine before we reached the track. The automobile was at the point marked letter 'S' in lead pencil on this plat (Exhibit 10) when the electric car struck it. (Witness is shown Plaintiffs' Exhibit 1, which is a large

photograph.) I recognize the surroundings in this picture, and it shows the appearance of the highway at that time. It would be hard to make a mark on this picture to show where we were when the electric car struck us. It would be right in behind that railing. It is hard to make a mark there. I mean the railing that is on the platform in front of the store. This road as shown on this picture is a downgrade towards the car track. Our automobile weighed, when it was not loaded with passengers, close to 5,000 pounds. Exhibit No. 9 is a picture of the crossing where the collision took place, and I am able to make an indication on this picture as to where we were when the electric car struck us. This is indicated by the letter 'S' which I now mark on it, so that the point at the letter 'S' on Exhibit 9 is approximately the location where the collision took place. As we approached the crossing, we were going at a speed, I should judge, of about 15 miles an hour, not to exceed that. Ordinarily I could bring this automobile to a standstill when proceeding at that rate under similar conditions, in about 25 feet. * * * I have been driving an automobile about 7 years, and am familiar with the general conditions under which an automobile should be operated. * * * Since this accident occurred, I have made personal observations of the surrounding conditions at the crossing, and I have made observation with reference to the ability to see a south-bound car or train approaching this crossing, and have also made observation with reference to the sound that is made by such a car, especially with reference to the ability of one being at this crossing to hear the approaching car. Last summer was the last time I made these observations. I also made similar observations shortly after the accident. I found that, while you could see the car at the bridge, it goes completely out of sight from that time until it gets to the crossing. I mean by this bridge the one that is shown on Plaintiff's Exhibit 10, which is the bridge for the main highway across the Duwamish river."

The witness Isaac N. East testified for the plaintiffs, among other things, as follows:

"My occupation is that of a tea man. I have a tea and coffee route through the country in the south end of the town, and was engaged in that business in July, 1912. I have been in it for the last nine years, and I travel out through the various neighborhoods south of Georgetown. My territory is from Spokane Avenue South to Des Moines, and between the Sound and the N. P. Railroad, and I take in Tukwila and Foster; that is, I have the territory for selling our teas in that locality. I have regular customers up there that I call every week. I have a regular route that I travel once a week. I make the trip with a team and wagon. In July, 1912, my team was a Grand Union tea wagon. I guess most everybody is familiar with it. It is just a medium size delivery wagon, two horses; one is a gray horse and the other is a bay, and they weigh about 1,000 pounds apiece. I am familiar with the highway crossing across the Riverton crossing, and have been familiar with it for more than seven years. I have been over this road once a week, up and back, as a rule, unless there was a holiday came on my delivery date. For seven years, or probably a little more than that, I have been over it once a week, and during that time have become familiar with the traffic that passes over it. There is almost a continuous traffic there during the day, and it was fully as much in July, 1912, as any time before or since, I think. I didn't see any difference. It doesn't vary much. And that congested traffic has existed ever since I have been going over the road. I must have been over that crossing between 700 and 800 times. * * * I have stated that in July, 1912, and for some time prior to that, it was almost a continuous traffic over that thoroughfare during the daytime. There are teams there backwards and forwards almost all the time. At that time I think there were four trains a day passing over the tracks—two single cars, and two double-car trains, and then sometimes a freight train in between them. The single cars were known as the 'flyer,' or 'limited.' By that is meant that it does not stop between Seattle and Tacoma as I know of; maybe it stops at Auburn. I don't know as to that. I never rode over it, but it makes no stops at the stations this side of

Kent. The rate of speed that those limited trains usually run over this crossing was about 25 or 30 miles an hour. At about 4 o'clock on the afternoon of the day the accident occurred, I was coming home right there just about Riverton; was approaching the crossing. I saw the automobile that was occupied by some one. I did not then know who it was, but I afterwards found it was the doctor. They passed me somewhere near where Dr. Brown used to keep his automobile. I don't know just how far that is. Anybody that is familiar with the road knows it sits right in the bank on the right-hand side as you go south. They overtook me and passed me on the left side. At the time I was traveling about 4 or 5 miles an hour, and the rate of speed that the automobile was proceeding at was probably 12 miles an hour. After they passed me, I kept going right along behind them, and I saw the electric car strike the automobile. I was probably 50 or 75 feet from the crossing when the collision took place. I could not tell exactly. I was just behind those people a little ways. I did not hear any whistles from the approaching car. I was right there on the road. I think I could have heard the whistle of the train if anybody could. The alarm gong there at the crossing was not ringing. I am positive of that. Several minutes after the accident it was ringing, because I stood right under it. (Witness shown Plaintiffs' Exhibit 6, a photograph showing this electric gong.) I stood right here, just across the street. I just helped the lady upon her feet that was thrown out of the automobile, and stepped back a few steps and stood there. It was quite a little bit after that before the gong began ringing. I could not say just how long. I did not look at my watch. The automobile was coming down, at a slow rate of speed, and the car darted out from behind that hill there and struck them. The front wheels of the automobile stood on the plank that lies on the right-hand side of the right-hand rail going south. It shoved the tires back from the bottom of the automobile about that far (showing), probably a foot or 15 inches, and the left-hand wheel took up a little sliver in the plank that stood up about that high (showing); at least it was partially took up and stood right that way, and the automobile cramped to the right and ran back, and turned a little more than half way round, with the end rather turned back up the street. After the collision the two ladies laid in the street—one across the cattle guard, with her head towards the east and her feet a little bit towards the northwest; the other one laid with her face towards the cattle guard in the street; and the doctor laid up under the freight shed. The top of the automobile was down, so that I could see the occupants all the time, as I was sitting above them in the wagon. The seat in my wagon is so arranged that it is elevated high enough so that I could see over the horses and into the automobile. I was about 50 feet from the automobile when the car struck it, or a little less, I could not tell exactly; but I know I was there almost in a minute with my team hitched and on the ground. The doctor was killed. He was dead when I got to him. I helped what I heard afterwards was the doctor's sister—helped her to get upon her feet. The other lady, there was a number of other people helping her, so that I didn't need to go there. I did not hear the train approaching. Q. What has been your observation with respect to being able to see a south-bound car on the west track as it approached this crossing? A. I should judge you would have to be within 25 feet of the track at the least calculation to see it, because there is a bluff and shrubbery and one thing and another there that obstructs your view, and then the car circles in towards the bank. I could not say positively whether or not it is a fact that, if a person stood between 50 and 60 feet west of the track, they could see a south-bound train at all times after it left the Riverton station. I never took any notice as to that. I have noticed that from that crossing and other places it is nearly impossible to hear where there is a bank or a bluff shields it. I did not hear that day this south-bound car. I have noticed at other times that it has been difficult to hear the train approaching, because I know that I came near driving out there onto the road because I heard nothing. That was before the gong was there. Q. Can one readily hear the rumble of the approaching train? A. I think not. This is on account of the bluff, I suppose. The bluff diverts the sound eastward."

Another witness for the plaintiffs—Elora Lamb—testified, among other things, as follows:

"My age is 21. I am a chauffeur and mechanic, and was such in July, 1912, and am accustomed to driving automobiles. At about 4 o'clock in the afternoon of July 25, 1912, I was standing on the waiting or passenger station of defendants' railroad at Riverton, waiting for the Seattle or north-bound train. I saw Dr. Rininger's automobile approaching the crossing. (Witness shown Plaintiffs' Exhibit 10.) I notice the station in this picture. I was standing on the platform at about the point marked 'A' in pencil thereon. I should judge that the automobile was approaching the crossing at a rate of speed between 12 and 15 miles an hour. It was being driven by Mr. Brodnix. Q. Did you observe whether or not he made any effort to see whether a train was approaching? A. I seen him looking both ways. At that time I could and did, from my side, see the south-bound car on the west track of the defendants' line. It was at the rock quarry when I first saw it, just between Allentown and the rock quarry, which is a point north of the Allentown station, and I continued to observe it as it proceeded southward, and observed it until it struck the auto. From where I was on the platform I could see it during all the time that it was going south. It was running at a rate of speed between 45 and 50 miles an hour. It seemed to slacken just a little bit, not much, as it approached the crossing. I did not hear any whistles blown on the train, and I was watching it all the time. I am sure I could have heard the whistles if any had been blown on this train. There was nothing the matter with my hearing. It was all right, and there was no defect in my vision or means of seeing at the time. The whistle was not blown. I did not hear it at all. I am sure I could have heard it if it had been blown, because I have heard them lots of times there. The electric gong maintained at the crossing did not ring at that time. I was about 75 feet from it. After the collision, when the next flyer came through, it rang. It rang regularly, and did not ring fast—you know, now and then a tap. At that time I had been out home to see my parents, who lived out beyond there at that time, and continued to live there until about five months ago. It was a frequent occurrence for me to go out there to that station. I went out every week. At that time I was familiar with the driving of automobiles. The automobile was approaching the crossing at a rate of between 12 and 15 miles an hour."

There was certainly in the foregoing quotations testimony tending to show that the defendant company's car not only approached the crossing where the accident occurred at an excessive speed—at from 40 to 45 miles an hour according to two of the witnesses—but positive testimony of two of them that the alarm gong did not ring, and testimony tending to show that the deceased, as well as his chauffeur, looked and listened both north and south in approaching the railroad track before attempting to cross it, and tending to show that they neither heard nor saw the approach of the car, and tending to show that they were at the time only going at the rate of from 12 to 15 miles an hour. Under such circumstances, we think it clear that the trial court was not justified in holding as a matter of law that the deceased was guilty of contributory negligence, or that the defendant company was not guilty of any negligence. The testimony being substantially conflicting, both as respects negligence of the defendant company and contributory negligence on the part of the deceased, the case was peculiarly one for the jury under appropriate instructions.

The judgment is reversed, and the cause remanded for a new trial.