### THE MARY B. CURTIS. THE ELLIS. THE PITTSBURG.

(Circuit Court of Appeals, Fifth Circuit. February 13, 1918. Rehearing Denied April 3, 1918.)

#### No. 3107.

1. ADMIRALTY ⊂⊃106—APPEAL—PARTIES.
   To an appeal by claimants in a suit in rem in admiralty, a surety company, which executed the stipulation for release of the libeled vessels, is an indispensable party, and must either be joined or notified and a severance effected.

2. APPEAL AND ERROR ⊂⊃329—PARTIES TO APPEAL—BRINGING IN BY AMENDMENT.
   The Circuit Court of Appeals may permit a party which has been omitted from an appeal, and not summoned and severed, to be brought in by amendment, where it appears and waives citation.

3. COLLISION ⊂⊃74—TOW AND MOORED DREDGE IN CANAL—FAULT.
   Libelant's dredge, engaged in government work in the Sabine-Neches Canal, was lying moored to the side of the canal on Sunday, when it was brought into collision with a barge, which was passing through the canal in tow of two tugs, and sunk. Held, on the evidence, that the dredge was not in fault; that it was moored in a proper place, and was kept as close to the bank as possible; that it was not in fault for assenting to the passage of the tow, for which there was room, the canal being 200 feet wide; that the tugs were in fault for improper navigation of the tow of which they were in full charge; and that the barge was also in fault for unnecessarily allowing her anchor to hang on her side partly below the water line, which struck the dredge and caused the sinking, which was the principal cause of injury.

4. COLLISION ⊂⊃132—DAMAGES—ELEMENTS.
   Proof of damages recoverable for the sinking of a dredge, consisting of evidence as to the cost of labor and materials used in raising the dredge,

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the cost of repairs, and demurrage during the time reasonably required for making the repairs, based on the rental value of the dredge, *held* properly admitted, and sufficient to sustain the award made.

5. COLLISION ⬥130—DAMAGES—INTEREST.

While the allowance of interest on the award in collision cases, where the libelant is without fault, is discretionary, the general practice is, in cases where the amount of damages is uncertain and is matter for proof, to allow interest only from the date of liquidation by decree; and this rule is especially applicable where repairs were unnecessarily delayed by libelant, and where the repairs put the vessel in better condition than before collision.

Appeals from the District Court of the United States for the Eastern District of Texas; Gordon Russell, Judge.

Suit in admiralty for collision by the Bowers Southern Dredging Company against the barge Pittsburg, the Sun Company, claimant, and the tugs Mary B. Curtis and Ellis, the D. W. Ryan Towboat Company, Incorporated, claimant. Decree for libelant against both claimants, and they appeal. Modified and affirmed.

John Charles Harris, of Houston, Tex., for appellant Ryan Towboat Co.

T. L. Foster, of Beaumont, Tex., E. E. Townes, of Houston, Tex., and Jas. B. Stubbs, of Galveston, Tex., for appellant Sun Co.

John D. Grace, of New Orleans, La., F. D. Minor and F. D. Minor, Jr., both of Beaumont, Tex., and John Neethe, of Galveston, Tex., for appellee.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. This case comprises two separate appeals from a decree in admiralty rendered by the District Court for the Eastern District of Texas in favor of the appellee, the Bowers Southern Dredging Company, in each appeal, and against the respective appellant, and its coappellee. The appellees, against whom the decree was rendered, severed and separately appealed, joining their respective corespondents as appellees. The cause of action arose out of a collision in the Sabine-Neches Canal between a dredge of the Bowers Southern Dredging Company and a tow and its two tugboats. The tugboats belonging to the D. W. Ryan Towboat Company, and the barge, which was being towed, to the Sun Company.

[1] There was submitted, with the submission on the merits, a motion to dismiss each appeal. The motion was predicated upon the failure of the appellant to make the Lion Bonding & Surety Company an appellee, or to obtain as to it, in each appeal, a summon and severance. No notice of appeal was served on the Lion Bonding & Surety Company in either appeal. The Lion Bonding & Surety Company executed with the respective appellants a stipulation for the release of the tugboats and the barge which had been seized by the libelant, and the decree appealed from was rendered against the two appellants, as principals, and the Lion Bonding & Surety Company, as the surety for each of the principal respondents. The first question presented by the mo-

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tion to dismiss is whether the Lion Bonding & Surety Company was a necessary party to the appeals.

On this question, we are unable to distinguish this case from the case of The Bylands, 231 Fed. 101, 145 C. C. A. 289, which, upon the authority of Estis v. Trabue, 128 U. S. 225, 9 Sup. Ct. 58, 32 L. Ed. 437, and Ex parte Sawyer, 21 Wall. 236, 22 L. Ed. 617, held the surety, upon a like stipulation, to be an indispensable party to the appeal, and one that should either be joined in the appeal or a severance effect-ed, and the surety notified of the taking of the appeal. As that case is the law of this circuit, and as the Supreme Court denied a certiorari in it, we feel bound, to follow and apply the rule there announced to this case.

[2] Each of the appellants have filed motions to amend the petition for appeal, and the citation, by making the Lion Bonding & Surety Company a party thereto, and for leave to file an amended appeal bond. The Lion Bonding & Surety Company has also appeared in this court, and waived the issuance and service of a citation, and moved for leave to join in and become a party to each of the appeals. The second question presented by the motion to dismiss is whether the appellants should be here allowed to amend their appeal by making the Lion Bond-ing & Surety Company a party to it, upon its appearance and waiver of citation and offer to join in the appeal and become a party to it. In ruling on this motion to be allowed to amend, we are confronted by what is apparently an irreconcilable conflict in the rulings of the Su-preme Court.

In the case of Estis v. Trabue, 128 U. S. 225, 9 Sup. Ct. 58, 32 L. Ed. 437, the Supreme Court seems to have held that the omission to make the surety a party to the appeal was jurisdictional and could not be amended in the Supreme Court, though no application to amend was submitted to the court in that case. In the case of Inland Coasting Company v. Tolson, 136 U. S. 572, 10 Sup. Ct. 1063, 34 L. Ed. 539, the Supreme Court, having dismissed the writ of error because of a similar defect on the original hearing, upon rehearing granted a motion to rescind the judgment of dismissal, to restore the cause to the dock-et, and to amend the writ of error by inserting certain parties as plain-tiffs in error, and upon amendment the cause was ordered returned to the docket. In the case of Mason v. United States, 136 U. S. 581, 10 Sup. Ct. 1062, 34 L. Ed. 545, an application to amend a writ of error, by adding omitted parties as plaintiffs in error or for a severance of such parties, was denied, and the writ of error dismissed for the defect in parties, without discussion. In the case of Dolan v. Jennings, 139 U. S. 385, 11 Sup. Ct. 584, 35 L. Ed. 217, the Supreme Court held that a failure to join a necessary party in the appeal, or to effect a sever-ance, was fatal to an appeal considered four years after the final de-cree, and when the omitted party did not voluntarily appear before the court and submit himself to its jurisdiction. On page 387 of 139 U. S. (11 Sup. Ct. 585 [35 L. Ed. 217]) the court said:

"More than four years have elapsed since the final decrees were entered, and, as we have never had jurisdiction over the legal representatives of the deceased complainant, it is impossible for us to obtain it now."

And in speaking of the case of Mason v. United States, supra, the court said:

"In Mason v. United States, 136 U. S. 581 [10 Sup. Ct. 1062, 34 L. Ed. 545], the application to amend being made more than two years after the entry of the judgment, and the omitted parties being in no way in court, the application was denied and the writ of error dismissed."

In the case of Estis v. Trabue, cited by the court at the end of the extract just quoted, the writ of error was dismissed more than three years from the date of the final decree, the omitted parties were not before the court, and the court had lost jurisdiction to compel their involuntary appearance. In the case of Inland & Seaboard Coasting Company v. Tolson, 136 U. S. 572, 10 Sup. Ct. 1063, 34 L. Ed. 539, the application to amend came when the time for suing out a second writ of error had expired. The application was for leave to amend by inserting the names of the omitted parties as plaintiffs in error, and this implied authority to appear for them in the counsel for the original plaintiffs in error, who made the motion to amend. In that case there was nothing in the "appeal papers" from which the amendment could be made, and consequently the cases of Moore v. Simonds, 100 U. S. 145, 25 L. Ed. 590, and Knickerbocker Insurance Company v. Pendleton, 115 U. S. 339, 6 Sup. Ct. 74, 29 L. Ed. 432, did not support the right to amend. Yet the Supreme Court granted the motion, allowed the amendment, and reinstated the case on the docket with the new plaintiffs in error.

From the facts of the case of Inland Company v. Tolson, we must conclude that, where the omitted parties voluntarily appear before the appellate court and submit themselves to its jurisdiction, the amendment will be permitted, even though the time for suing out a writ of error or appeal had expired, and even though there is nothing in the appeal papers by which the amendment could properly be made. In this case, also, the time for taking an appeal had expired before the application to amend was presented to this court, and there is nothing in the appeal papers by which the amendment could be made. It is also true, however, that in each appeal the application to amend is accompanied by the voluntary appearance of the omitted party in this court, and its waiver of citation, and its application to be allowed to join in the prosecution of the appeals. We think this case comes within the facts of the cases of Inland Company v. Tolson, and Gilbert v. Hopkins, 198 Fed. 849, 117 C. C. A. 491, in the Fourth Circuit, and Rininger v. Puget Sound Electric Company, 220 Fed. 419, 136 C. C. A. 43, from the Ninth Circuit, and is to be distinguished, in the respect mentioned, from the cases of Estis v. Trabue, Mason v. United States, and Dolan v. Jennings, supra, and that the application to amend should be allowed, and the motion to dismiss the appeal, if and when the amendment is made, be denied.

[3] . Coming to the merits, the case arose out of a collision between a dredge of the appellee, the Bowers Southern Dredging Company, and a barge, belonging to the Sun Company, named the Pittsburg, and two tugboats of the D. W. Ryan Towboat Company, Incorporated, the

Mary B. Curtis and the Ellis. The collision occurred in the Sabine-Neches Canal, at the point where it is intersected by the Neches river. The dredge was moored to the bank of the canal. The day of the collision being Sunday, no dredging had been done on that day, but some incidental work, preparatory to the next week's work, had been done on Sunday morning, preceding the time of the collision. The dredge was engaged in deepening the channel of the canal for the United States government. The channel of the canal, at the point of the collision, was about 200 feet wide. The tow and its tugs were proceeding down the canal, and had to cross the Neches river before reaching the place where the dredge was moored to the bank of the canal. As the tugs and their tow approached the Neches river, they signaled the dredge, to attract the attention of its crew to the approach of the fleet. After attracting the dredge's attention, the evidence tends to show that the dredge sounded two whistles which the tugs claim was an invitation or permission for them to proceed and pass the dredge. Those on the dredge claim that one of the tugs gave the two-whistle signal, and that the dredge merely answered it with a like signal, which was only an acknowledgment of the tug's notice that it was about to pass. The fleet thereupon proceeded down the canal across the river and past the dredge.

The evidence is in hopeless conflict as to the course of the fleet. The evidence of the appellants was to the effect that the fleet took a circuitous course, made necessary by the current and wind, from the point where it was signaled to pass the dredge; while that of the appellee, the Bowers Southern Dredging Company, is to the effect that fleet took a direct course from that point to the dredge. It is undisputed that the proper course to avoid collision with the dredge, and at the same time to avoid going ashore in shoal water at the intersection of the river and the canal, opposite to where the dredge was moored, was the circuitous, and not the direct, course. The evidence is also in sharp conflict as to the position of the dredge with reference to the bank of the canal to which it was moored. The evidence of the appellants is to the effect that the stern of the dredge was 110 feet from the bank of the canal, leaving the width of the channel beyond the dredge but 90 feet. On the other hand, the evidence of the appellee, the dredge company, was to the effect that prior to the collision, but on the same morning, the tug Juno, in charge of the barge Pettibone passed the dredge in its progress through the canal, and that the dredge, to give the tug and its tow ample room for passage, was pulled up close to the bank of the canal, to which it was moored, and that it remained in this position, hugging the bank, until the collision.

There was also a dispute as to whether the dredge had a right to occupy the position in the canal in which it was moored, in view of the fact that it was not engaged in dredging on the day of the collision. As the fleet approached the dredge and reached the canal, after having crossed the river, it got into shoal water, and this made navigation difficult. In order to avoid collision with the dredge, the engines of the tug Ellis, the smaller of the two tugs, were reversed, and, this failing to arrest the progress of the fleet towards the dredge, the engines of the

Mary B. Curtis, the larger of the tugs, were then reversed. The Curtis being the more powerful tug, the reversal of her engines swung the fleet towards the dredge, and seems to have been the immediate cause of the collision. The anchor on the barge Pittsburg was hanging on her side at her hawse hole, partly below the water line. It was on the side of the barge that was towards the dredge, and that struck the dredge when the two collided.

It is claimed that the anchor ripped a hole in the side of the dredge below the water line, and that the collision between the barge and the dredge would have been harmless to the latter, but for the presence of the anchor and its alleged improper position on the side of the barge. The contention is that the damage to the dredge was due to the fact that it sunk, and that it would not have sunk, in spite of the collision, but for the position of the anchor on the side of the barge and below the water line. The navigation of the fleet was in charge of the captain of the tug Mary B. Curtis. The captains of the barge Pittsburg and the tug Ellis navigated their vessels in obedience to the directions of the captain of the Curtis.

The foregoing were the ultimate facts of the collision, as they affect the respective liability of the parties to it, the Ryan Towboat Company, the Sun Company, and the dredging company. From them the District Judge arrived at the conclusion that the dredging company was free from fault, and that the Ryan Towboat Company and the Sun Company were jointly liable for the collision, their fault being mutual.

The fault charged against the dredging company was (1) in assuming unnecessarily a position in the canal where it was a menace to those navigating the canal, and (2) in inviting by its signal the fleet to pass it while in a dangerous position and by a dangerous method.

(1) In view of the difficulty with which the dredge was moved, and the time and expense incident to moving it, and in view of the shoal water in the part of the river adjacent to the entrance of the canal, and in view of the fact that there was ample room to navigate the canal, if the dredge was properly moored to the bank of the canal, and if the vessels navigating the canal did so with proper care, we agree with the District Judge's finding that no fault can be charged against the dredge in respect of its position. We also find that the preponderance of the evidence shows that the dredge was moored close to the bank at the time of the collision. The evidence shows that it was hauled up to the bank at the time the Juno and tow passed, and there is no evidence that it was moved from this position until after the collision. Its position after the collision is satisfactorily explained by the slope of the bank and the effect of the collision itself in moving it from the bank.

(2) The evidence is conflicting as to whether the captain of the dredge merely acknowledged the signal given by the fleet of its approach and of its intention to pass the dredge, or whether his signal amounted to an invitation to do so. If the fleet took the proper and circuitous course of approach to and passage by the dredge, no fault could be predicated on the giving of the signal, though it was an invitation to pass, since it is clear from the evidence that the fleet, by careful navi-

gation, adopting this course, could have safely passed the dredge without mishap. If so, there was no fault in inviting it to do so. The fault was in the subsequent unskillful navigation of the fleet in approaching and passing the dredge, viz., in permitting the fleet to get in shoal water, where navigation was difficult, and in the reversal of the engines of the Curtis at a time when the effect was to draw the fleet against the dredge. The fault would in that event have been solely that of the fleet, if the position of the dredge in the canal was not fault, and we have so determined.

The other contention is based upon the aspect of the evidence that the fleet took the direct course across the river in approaching the dredge; that the wind and current made this a dangerous thing to do; that the dredge invited the fleet to approach in this course, knowing of the danger of doing so, and thereby participated in the fault that produced the collision. Conceding that the dredge did more than recognize the fleet's signal, and in fact invited the fleet to approach and pass it, we do not think that fault can be based on such an invitation for these reasons. It does not appear that the invitation directed the course to be pursued by the fleet in accepting it, or that the dredge had actual or imputed knowledge when it gave the invitation that the fleet would act upon it by taking the dangerous course. It is also not satisfactorily shown that careful navigation over the direct course would not have availed to avert the collision, or that the dredge could have reasonably anticipated that its invitation, carefully acted upon by the fleet, whatever course it took, would have likely resulted in disaster. That there was unskillful navigation in handling the fleet as it passed the dredge, and that it precipitated the collision, is clear. We think there is ample ground for a finding that, in the absence of such improper navigation, the passage of the fleet over the direct course would have been so reasonably free from danger as not to have made an invitation to pursue it negligence.

It must be remembered, in considering this question, that the officers of the dredge knew that the officers of the fleet were familiar with the canal and the position of the dredge in it; that they knew the width of the fleet and its draft, and the width of the channel and its depth, and were in a better position to know whether navigation by the direct course was safe for a fleet of the width of beam and depth of draft of the instant one than the officers of the dredge could be. The signal, at most, amounted to a permission, and was in no sense a direction; and this is true, though the dredge had the right of way and could have prevented the passage of the fleet. The fleet had the right to pass or anchor, as it saw fit. The dredge did no more than signify its willingness for the fleet to pass, if it desired. Whatever might be the effect of an invitation to proceed, when proceeding was fraught with imminent danger, known to the person giving the invitation, and unknown to the person acting on it, we do not think this is such a case. The danger under proper navigation was not unreasonably great; it was known as well or better to the fleet than to the dredge, and was to be acted upon by the fleet only at its option and consequently at its peril.

Finding the dredge to have been free from fault, we come to the conduct of the officers of the tugs and of the barge. The evidence satisfactorily establishes the responsibility of the tugs for the navigation of the fleet. The captain of the tug Curtis directed the navigation of the fleet, and the captain of the barge Pittsburg navigated the barge subject to his orders. The relation between the owners of the tugs and the owner of their tow was that of independent contractor and contractee, and the owners of the tow would not be responsible for the negligence of the tugs' officers in navigating the fleet. Aside from the responsibility of the owners of the barge, if any, arising from the position of the anchor on the barge, they were under no responsibility to the dredge company for the damage caused by the collision.

We have no doubt that the captain of the tug Curtis was negligent in his management of the fleet. If he steered the fleet in the direct course across the Neches river to the point at entrance to the canal, where the dredge was moored, he was negligent in selecting a dangerous course, when a safe one was open to him. If he pursued the circuitous course, then it follows that careful navigation of the fleet would have enabled it to have passed the dredge in safety. The dredge being stationary, responsibility for the safe passage was presumptively placed upon the fleet. The fact of collision, under such conditions, would prima facie impute fault to the moving fleet. The reversal of the engines of the Curtis was an act of negligence, and a direct cause of the collision. The placing of the tugs abreast of the barge, giving the fleet a width of beam of 70 feet, with knowledge that the dredge was to be encountered in the narrow channel of the canal, was also a negligent act on the part of the person in charge of the navigation of the fleet. Without referring to the various other acts of fault charged against the fleet, we think those mentioned are enough to support the decree against the D. W. Ryan Towboat Company.

Coming to consider the liability of the Sun Company, as the owner of the barge Pittsburg, we have said that its liability, if any exists, depends upon whether the position of its anchor, hanging from its side at the hawse hole and extending below the water line, was a negligent one. This is not a case where the position of the anchor merely aggravated in an undefined degree the damage done by the collision, which would have been the case if the dredge had not sunk, and if the damage had consisted of the crushing due to the blow. In this case, the substantial damage was due to the sinking of the dredge. If the dredge had been struck, but had not sunk, the damage would have been inconsequential. The substantial damage was the result of the sinking of the dredge, and the cause of its sinking was the cause of the damage. We think the evidence justified the finding of the District Judge that, but for the presence of the anchor at the side of the barge and below the water line, the dredge would not have been sunk by the collision; and that the effect of the position of the anchor was to tear a hole in the side of the dredge below the water line, which would not have otherwise happened from the collision.

It consequently becomes necessary to inquire whether the presence of the anchor in the position described was due to negligence on the

part of the owners of the barge. The evidence shows that the anchor had been carried in that position for two weeks before the collision. The barge was during that time being navigated up and down the narrow channel of the canal, where collisions were for that reason at least probable, even where due care was exercised, and quite likely to occur, where it was wanting. The officers of the barge also knew that the dredge was in the canal, and that the barge would necessarily have to pass and repass it. Under these conditions, we think the captain of the barge should be held, in the exercise of ordinary care, to have reasonably anticipated the likelihood of damage resulting from such a position of the anchor, and that the unnecessary carrying of the anchor in a position where it might strike a vessel below the water line would be negligence on his part. For this reason, we think that the decree fastening a moiety of the responsibility upon the Sun Company as owner of the barge was a proper one. It seems reasonably certain that a collision, had there been no anchor on the side of the barge, would not have caused a sinking of the dredge, and practically all the damage was the result of the sinking of the dredge. However, the captain of the Curtis knew of the position of the anchor on the side of the barge, and was not without fault in navigating the fleet with the anchor of the barge in an improper position, aside from the other fault to be attributed to him.

[4] Complaint is made of the amount of damages awarded the libelant under the final decree, both because of the method of proof of the items constituting it and because of its alleged excessive amount. The damages allowed, apart from demurrage and interest, were supposed to represent the cost to the libelant of raising and repairing the sunken dredge. The items consisted of labor and material. The method of proving the items of labor cost is not criticized. Criticism is made of the method of proving the cost of materials used for raising and repairing the dredge, as being by secondary and hearsay evidence. According to the course of business of libelant, material was purchased on order blanks in quadruplicate, and for its general use; one copy of the order going to the seller, and three being retained by the purchaser. It was the duty of the employés of the libelant to check the material received against the amount ordered, as shown by the order blank, and to distribute the material to the different jobs for which it was used, and to mark the distribution on the order blank. The libelant paid for the material on bills of the seller which corresponded with the approved order blanks, and the amounts paid were distributed on the books of the libelant to the different jobs, according to the distribution made by the employés of the libelant, who received and handled the material. First-hand proof was not made of the receipt and actual use of the material, charged to the raising and repair of the sunken dredge, for that particular job of work. It is manifest that a requirement of first-hand proof of that character for each item of material used in the raising and repair of the dredge would be so burdensome and costly as to be prohibitive, if it could be produced at all. We think proof of the items, by proof of the usual course of business of libelant, and of their correctness according to that course of business, was sufficient as a

prima facie showing, and this character of proof was accompanied by proof of experts that the material in amount and kind and value would be reasonably needed to accomplish the raising and repairing of the dredge. The proof was satisfactory to the master and to the District Judge, and we are satisfied, both with the character of proof permitted by them and with their conclusions as to the aggregate amount of the cost of raising and repairing the dredge.

With reference to the complaint concerning the amount of demurrage allowed the libelant, the evidence of libelant's manager, Crandall, was that the monthly rental value of the dredge was from $2,500 to $3,000; that of Ryan, the manager of the D. W. Ryan Towboat Company, that it was from $1,200 to $1,500. The District Judge allowed for demurrage $7,500, $2,500 a month for three months. The award was not based upon profit earned by the dredge but upon its rental value. It was not allowed for the period the dredge was actually out of commission, a period of ten months, but only for the period (three months) which the master and the District Judge ascertained from the proof was actually necessary for its raising and restoration, if reasonable expedition had been employed to that end by the libelant. The master allowed the lowest amount testified to by the witness Crandall, rather than the amount fixed by Ryan, assigning as his reason that Crandall showed greater familiarity with dredges and their rental value than did Ryan, and the District Judge approved this finding. The difference between the values fixed by the two witnesses was $1,000. We are not willing to disturb the master's conclusion, concurred in by the District Judge, in view of their better opportunities to determine as between the two witnesses.

[5] The master and the District Judge awarded interest upon each item from the date of payment until the date of final decree, the interest aggregating $4,210.48. The allowance of interest on the award in collision cases, where the libelant is without fault, is discretionary (The Itasca [D. C.] 117 Fed. 885; The North Star, 62 Fed. 71, 10 C. C. A. 262), though "the general rule of law, or practice, rather is to allow interest * * * where the amount of damages is uncertain and is matter for proof, from the date when they were liquidated; that is, fixed by judicial ascertainment" (Kelley v. City of Cleveland, 176 Fed. 498, 100 C. C. A. 108). Two circumstances militate against the equity of allowing interest in this case prior to the date of final decree. The period of repairs was extended over a period of ten months, when the proof shows a period of three months should have sufficed. This necessarily postponed the date of the final decree, since the amount of damages were not ascertainable until the restoration of the dredge was completed. Again, parts of the dredge were put in better condition after the restoration than they were before the collision, since the new replaced the old. This advantage inured to the libelant, without cost to it, since it was allowed the full cost of replacement. In The Grace Danforth (D. C.) 97 Fed. 978, interest was disallowed because the District Court found that "the vessel was placed in better condition than before the collision." We think the equities of this case require the disallowance of interest prior to the date of the final decree.

The decree of the District Court is modified, by reducing its total amount to $41,481.14, and the amounts of the decrees against the respective respondents to one-half of that sum, or $20,740.57, and, as so modified, is affirmed.